**Billy Glen HARWELL**

v.

**AMERICAN MEDICAL SYSTEMS, INC.**

**No. 1:91–0107.**

United States District Court,
M.D. Tennessee,
Columbia Division.

Sept. 14, 1992.

---

Stewart, Estes & Donnell, Nashville, Tenn., Thomas J. Elmlinger, Brentwood, Tenn., for plaintiff.

Clarence J. Gideon, Jr., Linda Willis, Gideon & Wiseman, Nashville, Tenn., Philip E. Mischke, Mark Vorder–Bruegge, Jr., Charles M. Weirich, Jr., McDonnell Boyd, Memphis, Tenn., for defendant.

## MEMORANDUM

HIGGINS, District Judge.

The plaintiff, Billy Glen Harwell, a Tennessee citizen, filed this action[1] against American Medical Systems, Inc., a Minnesota corporation with its principal place of business in Minnetonka, Minnesota. The plaintiff's claims arise out of the malfunction of an inflatable penile prosthesis that is manufactured by AMSI. This prosthetic device was surgically implanted in Mr. Har-

---

1. This civil action was filed originally in the Lawrence County Circuit Court, but was removed to this Court under 28 U.S.C. § 1332. While Mr. Harwell challenged the removal, the Court declined to remand this action to the state court.

well on June 26, 1989. Mr. Harwell's claims are for negligence in the design of the prosthesis, strict liability for its unreasonably dangerous design, and breach of implied warranty of merchantability.

AMSI filed a motion for summary judgment on July 14, 1992 (Docket Entry No. 18) upon the grounds that the plaintiff's negligence and strict liability claims are time-barred under the applicable Tennessee statute of limitations and that there is no proof that its product was negligently designed, given the state of the art at the time its prosthesis was manufactured. Further, AMSI argues that this prosthesis is an "unavoidably unsafe product" under Section 402A, Comment k of the Second Restatement of Torts so that its warning to Mr. Harwell's physician, as a learned intermediary, precludes its liability to the plaintiff. Finally, AMSI contends that the Uniform Commercial Code does not extend to cover Mr. Harwell's breach of warranty claims because surgical implants represent the sales of services and the UCC applies only to sales of goods.

Mr. Harwell responds that his negligence and strict liability claims were filed within one year after he learned of the precise nature of the prosthesis' defect; that he was not warned of any dangers; that the UCC has been held applicable to surgical implants because the sale is to the physician as the patient's agent; and that based upon his expert's affidavit, there is a material factual dispute as to whether the prosthesis is unreasonably dangerous and was negligently designed. Mr. Harwell also seeks additional time under Rule 56(e), Fed. R.Civ.P., to submit evidence of a 1989 Food and Drug Administration investigation of this AMSI prosthesis about which Mr. Harwell's counsel recently learned.

For the reasons set forth below, the Court grants the defendant's motion for summary judgment upon the grounds that there has been adequate opportunity for discovery and that there is insufficient proof that AMSI's prosthesis was negligently designed or was an unreasonably dangerous product. The undisputed proof is that AMSI's prosthesis was the state of the art at the time. This device is also an unavoidably unsafe product for which AMSI made adequate disclosures to Mr. Harwell's physician, sufficient to preclude any liability to Mr. Harwell under Tennessee law.

### I.

On June 26, 1989, Mr. Harwell underwent the implantation of an AMSI 700 CX inflatable penile prosthesis. The AMSI 700 CX is prescribed by some urologists for patients with organic impotence by simulating a natural erection. This device was designed first by AMSI, which began distribution of its first version in 1973. The original design of the implant has been modified since 1973 to improve the device. According to Robert W. Pugh, the engineer who worked on the original design and subsequent modifications, the AMSI penile prosthetic implant at issue represented the state of the art for such devices at the time of Mr. Harwell's surgical implant.

The AMSI 700 CX consists of two expandable cylinders that are inserted within the shaft of the penis with a small pump that is implanted in the scrotum. The cylinders and pump are connected by silicone tubing. The pump also is connected by silicone tubing to a fluid reservoir that is implanted beneath the abdominal muscles. By squeezing the pump, fluid is transferred into the expandable cylinders, causing the penis to become erect. A small valve in the pump holds the fluid in the cylinders until the erection is no longer desired. When the release valve on the pump is pressed, the fluid returns to the reservoir, and the penis returns to its flaccid state.

On June 26, 1989, Dr. Tom Nesbitt, Jr., an urologist, implanted the AMSI 700 CX inflatable penile prosthesis into Mr. Harwell at Baptist Hospital in Nashville, Tennessee. Dr. Nesbitt showed Mr. Harwell the device and explained how it worked. Dr. Nesbitt told Mr. Harwell that the AMSI 700 CX was "the best product available to meet [Mr. Harwell's] needs." Dr. Nesbitt also states that he "fully informed" Mr. Harwell of the risks involved, noting that

"the primary mode of failure would be leakage."

As Mr. Harwell and his wife were going to have sexual relations on August 16, 1990, the device did not work. Mr. Harwell made an appointment with Dr. Nesbitt on the earliest available appointment date of August 30, 1990. On August 30th, Dr. Nesbitt determined that the prosthesis had a leak in its reservoir. Dr. Nesbitt replaced the reservoir in surgery on September 4, 1990. Mr. Harwell filed his complaint on August 30, 1991, in the Circuit Court for Lawrence County, Tennessee.

As to the cause of the leak in the reservoir, in his answers to interrogatories, Mr. Harwell states that "[t]he device's reservoir broke while inside the plaintiff's body within fourteen months after it was implanted and after being used only for the purpose it was intended." In his supplemental answers to interrogatories, Mr. Harwell states that

[t]his device has been recalled from the market three times by AMS for leakage. AMS underreported product complaints and failure to the FDA. After receiving over 3000 complaints about AMS' inflatable penile prosthesis, the FDA is requiring AMS to furnish evidence of the product's safety. See also attached affidavit of R.J. Hill.

Mr. Harwell notes that the AMSI warrants this device for five (5) years.

Mr. Harwell also submitted the affidavit of Dr. R.J. Hill, an engineer who inspected the prosthesis implanted in Mr. Harwell. Dr. Hill opines, in pertinent part, as follows:

4. I conducted the following tests on the reservoir of the AMS 700 CX device that is the subject of this lawsuit on July 31[,] 1992: A. microscopic examination of the reservoir, B. filling of the reservoir with water and visual examination for leakage.

5. My findings based on the preceding tests were as follows: A. A hole was found on the surface of the reservoir near the drain/refill tube, B. leakage of water was found from the observed hole,

and C. cracks were observed in various places along the reservoir wall.

6. Based on the above findings, I have concluded the following: A. the hole was formed as a result of a crack that began on the interior wall and propagated to the exterior wall, B. the hole was not a result of a puncture or slash from the exterior of the reservoir, and C. the hole was the result of material failure from repeated inflation and deflation of the reservoir.

7. As a result of research conducted into the studies made on prosthetic devices, in my opinion, the aforementioned leak could have been prevented if the reservoir had been constructed of polyurethane instead of silicon-elastomer.

Hill Affidavit at 2–3 (Docket Entry No. 23, Exhibit B; filed August 4, 1992).

Dr. Nesbitt, who has implanted forty to fifty of these prosthetic devices, does not have a medical opinion on what caused the reservoir in Mr. Harwell to leak. As to the warnings about the implantation of this device, AMSI includes a list of disclosures to physicians about problems with the AMSI 700 CX. The leaking of the reservoir is among the "Precautions" listed. Dr. Nesbitt does not recall whether he showed this AMSI information brochure to Mr. Harwell, but does distinctly recall his display and demonstration of the device to Mr. Harwell as a more effective method of explanation. Mr. Harwell disputes that he was warned about leakage, pain or possible follow-up surgery. The hospital supplies the prosthesis that is designated by Dr. Nesbitt.

## II.

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed.R.Civ.P. 56 advisory committee's note. In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.* Factual disputes that are irrelevant or unnecessary will not be counted.

*Id.* at 247–48, 106 S.Ct. at 2509–10, 91 L.Ed.2d at 211 (emphasis in the original and added in part).

The Supreme Court also defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986) (citations omitted).

In considering a summary judgment motion, there is a required showing by the moving party.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.... [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with

affidavits or other similar materials *negating* the opponent's claim.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986) (emphasis in original).

As the Sixth Circuit Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." *Martin v. Kelley,* 803 F.2d 236, 239 n. 4 (6th Cir.1986). The moving party's burden is to show "'clearly and convincingly' the absence of any genuine issues of material fact." *Sims v. Memphis Processors, Inc.,* 926 F.2d 524, 526 (6th Cir.1991). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth the specific facts showing that there is a genuine issue for trial.'" *Emmons v. McLaughlin,* 874 F.2d 351, 353 (6th Cir.1989) (quoting *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274, and Fed.R.Civ.P. 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must address more than a scintilla of evidence to overcome the motions [and] ... must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir.1989) (quoting *Liberty Lobby,* 477 U.S. at 257, 106 S.Ct. at 2514, 91 L.Ed.2d at 217). Moreover, the Court of Appeals explained that

[t]he respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

*Id.* at 1480. See also *Hutt v. Gibson Fiber Glass Prods.,* 914 F.2d 790 (6th Cir.1990) (A court deciding a motion for summary judgment must determine "whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must pre-

vail as a matter of law.") (quoting *Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2512, 91 L.Ed.2d at 214).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine under the governing law.

More important for present purposes, *summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party....*

....

Progressing to the specific issue in this case, we are convinced that *the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits.* If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, *the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff of the evidence presented.* The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. *The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict— "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."*

*Liberty Lobby*, 477 U.S. at 251–52, 106 S.Ct. at 2510, 2512, 91 L.Ed.2d at 211–212, 214 (citation omitted and emphasis added).

It is likewise true that

[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.

It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute...."

*Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir.1986) (citations omitted).

In a recent decision, the Court of Appeals further explained the district court's role in evaluating the proof on a summary judgment motion:

A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." *Webster's Third New International Dictionary* (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

*InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir.1989), *cert. denied sub*

*nom. Superior Roll Forming Co. v. Inter-Royal Corp.*, 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990) (citations omitted). Here, the parties have given some references to the proof upon which they rely. Local Rules of Court 8(b)(7)(a) and (c) require a showing of undisputed and disputed facts.

## III.

■ The Court addresses first, however, the issue of whether Mr. Harwell should be permitted additional time to discover records of a 1989 FDA investigation of AMSI's penile prosthetic implant referred to in a recent media report. A motion for summary judgment is to be considered "after adequate time for discovery...." *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. at 2552, 91 L.Ed.2d at 273. Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. *Emmons v. McLaughlin*, 874 F.2d 351, 355–57 (6th Cir.1989). "[T]he scope of discovery is within the sound discretion of the trial court ... The party opposing a motion for summary judgment possesses no absolute right to additional time for discovery under Rule 56...." *Id.* at 356. *But see Routman v. Automatic Data Processing, Inc.*, 873 F.2d 970, 971 (6th Cir. 1989).

■ Here, Mr. Harwell's counsel submits his affidavit about a public radio report on July 2, 1992, of an FDA investigation of AMSI's penile prosthesis complaints. A transcript of that radio report is attached. On August 1, 1992, Mr. Harwell's counsel wrote the FDA to verify this report and to obtain documents. Mr. Harwell's counsel has several microfiche of the complaints, but has not converted them to hard copy for submission to the court. This media report, however, noted that the FDA "found in 1989 that AMS had been underreporting complaints and product failures of its penile prosthesis for years and ... FDA was requiring AMS to present evidence of the safety of its penile prosthesis." Elmlinger affidavit at 4 (Docket Entry No. 23, Exhibit B; filed August 4, 1992). Mr. Harwell's counsel does not, however, state why he was unable to uncover the 1989 FDA investigation prior to the completion of discovery. There is no showing of any misrepresentation in AMSI's discovery responses in this action. The Court concludes that there has been adequate time for the parties to conduct discovery as to any defect in the design.

### A. Statute of Limitations

■ The Court next addresses AMSI's statute of limitations defense. The threshold issue on defendant's motions for summary judgment in this diversity action is which state's law applies to the parties' substantive claims and defenses. In a diversity case, the district court is obliged to apply the law of the forum. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). In addition, the conflict law of the forum determines which state's substantive law shall apply. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Telecommunications, Eng'g Sales & Serv. Co. v. Southern Tel. Supply Co.*, 518 F.2d 392, 394 (6th Cir.1975); *Bailey v. Chattem, Inc.*, 684 F.2d 386, 392 (6th Cir.1982). With these principles in mind, an examination of Tennessee's choice of law principles is necessary.

■ Under Tennessee law, for tort claims, Tennessee has adopted the "most significant relationship" test of the *Restatement (Second) of Conflict of Laws:*

### § 145. The General Principle

The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state, which with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

### § 6. Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability, and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

*Restatement (Second) of Conflict of Laws* §§ 6, 145(1) (1971); *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn.1992). In choosing the applicable law, the court considers the following contacts:

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties,

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

*Restatement (Second) of Conflict of Laws* § 145(2) (1971); *Hataway,* 830 S.W.2d at 59. With Mr. Harwell's surgery and injuries occurring in Tennessee, the Court concludes that Tennessee law should apply to Mr. Harwell's tort claims.

■ AMSI correctly argues that claims for injuries in product liability actions are subject to the provisions of Tenn.Code Ann. § 28–3–104 that such claims are to be brought within one year from the date that a plaintiff sustains his injuries or reason-

ably should have known of his injuries. Tennessee courts in a series of decisions beginning with *McCroskey v. Bryant Air Conditioning Co.,* 524 S.W.2d 487 (Tenn. 1975), apply the reasonable discovery rule as to the running of the applicable statute of limitation for personal injury actions. Under this rule, the applicable statute of limitation does not commence until an injury occurs or is discovered or until a reasonable person exercising due diligence should have discovered an injury or a legal claim. *Foster v. Harris,* 633 S.W.2d 304 (Tenn. 1982); *Gibson v. Lockwood Prods.,* 724 S.W.2d 756 (Tenn.Ct.App.1986); *Hathaway v. Middle Tenn. Anesthesiology, P.C.,* 724 S.W.2d 355 (Tenn.Ct.App.1986); *Woods v. Sherwin–Williams Co.,* 666 S.W.2d 77 (Tenn.Ct.App.1983). In *Foster* the Tennessee Supreme Court stated that "[i]t is axiomatic that no judicial remedy was available to this plaintiff until he discovered, (1) the occasion, the manner and means by which a breach of duty occurred that produced his injury; and (2) the identity of the defendant who breached the duty." *Foster,* 633 S.W.2d at 305.

As the Tennessee Supreme Court stated more recently, the statute of limitations commences "when [the] injury occurs or is discovered, or when in [the] exercise of reasonable care and diligence it should have been discovered." *Potts v. Celotex Corp.,* 796 S.W.2d 678, 680 (Tenn.1990) (citation omitted). AMSI also notes that Tennessee's statute of limitations is tolled "only during the period when the plaintiff has no knowledge at all that the wrong has occurred and, as a reasonable person, was not put on inquiry." *Hoffman v. Hospital Affiliates, Inc.,* 652 S.W.2d 341, 344 (Tenn. 1983).

In *Hathaway,* the Tennessee Court of Appeals applied the discovery rule to reverse the dismissal of a wrongful death action governed by the one-year statute of limitations for personal injuries. The Tennessee Court of Appeals held:

It is arguable that the "discovery rule" ... refers only to the discovery of the harmful effect of the tort. However, the reasonable interpretation of the statute consistent with authorities discussed

above is that "discovery" means the discovery of the existence of a right of action, that is, *facts which would support an action for tort against the tortfeasor. Such facts include not only the existence of an injury, but the tortious origin of the injury.*

*Hathaway,* 724 S.W.2d at 359 (emphasis added).

Here, AMSI argues that Mr. Harwell was put on reasonable inquiry when his prosthesis stopped working on August 16, 1990, but this action was not filed until August 30, 1991, beyond the limitations period. Mr. Harwell responds that the statute did not begin to run until he was examined by Dr. Nesbitt on August 30, 1990, and was informed as to how the device did not work. In this regard, Mr. Harwell cites the decision of the Wisconsin Court of Appeals in *SJD v. Mentor Corp.,* 159 Wis.2d 261, 463 N.W.2d 873, 877 (Ct. App.1990) wherein the Wisconsin court in a product liability action concerning a penile prosthesis held that the limitation action began only when "the known facts create reasonable certitude that a potential defendant was likely responsible for the harm." *Id.,* 463 N.W.2d at 876. Moreover, the Wisconsin court noted that there must be a reasonably objective basis for believing that the plaintiff had a claim.

The Court's review of the multiple Tennessee decisions under the *McCroskey* rule leads to the conclusion that the Tennessee statute of limitations for this type of claim commences when a reasonable person would have an objective factual basis for his tort claim. Under this rule, Mr. Harwell would not have known of the facts giving rise to any tort claim until he was so advised by his physician. To rule otherwise, in the Court's view, would encourage persons to file actions without having an

objective factual basis upon which to base a claim. As discussed below, the mere fact that a product does not work does not create a product liability claim under Tennessee law. Accordingly, AMSI's motion for summary judgment on the statute of limitations issue will be denied.

**B. The Product Liability Claims**

Mr. Harwell asserts several distinct theories of recovery, i.e., strict liability, negligence and breach of implied warranty, all of which are covered under the Tennessee Product Liability Act of 1978, Tenn.Code Ann. § 29–28–101 *et seq.*[2] In *Higgs v. General Motors Corp.,* 655 F.Supp. 22 (E.D.Tenn.1985), *aff'd sub nom. Thomas v. Subaru of America,* 815 F.2d 80 (6th Cir. 1987), the Honorable James H. Jarvis, District Judge, summarized the threshold requirements for all claims under the Tennessee Product Liability Act.

Indeed, it makes no difference whether the complaint is couched in terms of negligence, strict liability or breach of warranty, it has generally been held in the State of Tennessee that *in order for a plaintiff to recover under any theory of product liability, the plaintiff must establish that the product was defective and unreasonably dangerous at the time the product left the control of the manufacturer.*

*Higgs,* 655 F.Supp. at 23 (citation omitted) (emphasis added). *See also* Tenn.Code Ann. § 29–28–105(a) ("A manufacturer or seller of a product shall not be liable for any injury to person or property caused by the product unless the product is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.")

There are statutory definitions for "defective condition" of products and "unrea-

---

**2.** Tenn.Code Ann. § 29–28–102(6) defines "product liability" to include all of Harwell's claims: *"Product liability action" for purposes of this chapter shall include all actions brought for or on account of personal injury,* death or property damage caused by or *resulting from the manufacture, construction, design, formula, preparation, assembly, testing, service, warning, instruction, marketing, packaging or labeling of any product. It shall include,* but not

be limited to, all actions based upon the following theories: *strict liability in tort; negligence; breach of warranty, express or implied; breach of or failure to discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation,* concealment, or nondisclosure, whether negligent or innocent; or under any other substantive legal theory in tort or contract whatsoever. (emphasis added).

sonable dangerous" products. " 'Defective condition' means a condition of a product that renders it unsafe for normal or anticipatable handling and consumption." Tenn. Code Ann. § 29–28–102(2).

"Unreasonably dangerous" means that a product is dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics, or that the product because of its dangerous condition would not be put on the market by a reasonably prudent manufacturer or seller assuming that he knew of its dangerous condition.

Tenn.Code Ann. § 29–28–102(8).

■ Under Tennessee law, the unreasonable dangerousness of a product as well as a lack of warnings about a dangerous product that can serve as a basis for a manufacturer's liability, are usually jury questions.

It is ordinarily a question for the trier of fact whether the product is in a defective condition unreasonably dangerous to the user. Relevant to the determination of whether a product is defective and unreasonably dangerous is the presence or absence of a statement accompanying the product which in some way informs the user of the danger. This statement must be "calculated to bring home to a reasonably prudent user of the product the nature and the extent of the danger involved in using the product."

*Young v. Reliance Elec. Co.*, 584 S.W.2d 663, 668 (Tenn.Ct.App.1979) (citations omitted). *See also Kochins v. Linden–Alimak, Inc.*, 799 F.2d 1128, 1135 (6th Cir.1986); *Mello v. K–Mart Corp.*, 792 F.2d 1228, 1235 (1st Cir.1986).

■ Under Tennessee law, the warnings of dangers must be adequate in identifying the dangers posed by a product.

We agree, as we must, that adequate warnings can be relied upon by a manufacturer or seller to escape liability for failure to warn of non-obvious dangers associated with a product. However, we think that the statement quoted above presupposes warnings which are adequate. If it does not, then to that extent

we are not persuaded by it. The following observation points out the circularity of the presumption which defendant would have us adopt:

"The Restatement presumption would apply when a warning is actually given and, because it does not take into account whether that warning is adequate, it is in reality meaningless. If an adequate warning is given, there is no liability for failing to provide an adequate warning, and it hardly matters whether that adequate warning was read and heeded." J. Beasley, Products Liability and the Unreasonably Dangerous Requirement 439 (1981).

Thus, the question remains as to whether or not the warnings were adequate as a matter of law.

*Evridge v. American Honda Motor Co.*, 685 S.W.2d 632, 636 (Tenn.1985).

■ An adequate warning is also defined under Tennessee law as " 'one calculated to bring home to a reasonably prudent user of the product the nature and the extent of the danger involved in using the product.' " *Id.* The adequacy of the warning is a question for the jury unless reasonable minds could agree on the outcome. *Id.* at 637. If the danger is open and obvious, there is no duty to warn. *Pemberton v. American Distilled Spirits Co.*, 664 S.W.2d 690, 692–93 (Tenn.1984).

■ Under Tennessee law, a design defect is not established merely because there may have been a better design which would have prevented the injury:

A manufacturer is not an insurer of the product he designs, and it is not required that the design adopted be perfect, or render the product accident proof, or incapable of causing injury, nor is it necessary to incorporate the ultimate safety features in the product. Hence, a departure from the required standard of care is not demonstrated where it is simply shown that there was a better, safer or different design which would have averted the injury.

19 Tenn.Jur. *Negligence* § 14, at 411 (1985). *See Kerley v. Stanley Works*, 553 S.W.2d 80 (Tenn.Ct.App.), *perm. app. denied,* (Tenn.1977); *Gates v. Ford Motor Co.,* 494 F.2d 458, 460 (10th Cir.1974).

The Court addresses first whether AMSI knew or reasonably should have known that its prosthesis was an unreasonably dangerous product due to its defective design condition. Mr. Harwell relies, in part, upon the fact that the device did not work. This is the functional equivalent of arguing based on the *res ipsa, loquitur* doctrine that AMSI was negligent. Under the *res ipsa loquitur* doctrine, the injury does not occur absent negligence on the part of the person in exclusive control of the instrumentality which caused the injury. *German v. Nichopoulos,* 577 S.W.2d 197 (Tenn.App.1978). Under Tennessee law, the doctrine of *res ipsa loquitur* is not a substitute for proof of defect. *Browder v. Pettigrew,* 541 S.W.2d 402, 404 (Tenn. 1976). In *Allen v. American Medical Sys., Inc.,* 1989 WL 105626 (Tenn.Ct.App.1989) (Westlaw), the Court of Appeals declined to find product liability based upon the fact that the precise device at issue here did not function.

Thus, Mr. Harwell must present sufficient evidence that the injury resulted from a *defect* in the prosthesis and that the prosthesis was defective when it left AMSI's control. *Browder,* 541 S.W.2d at 404–05, citing *Mosier v. AMC,* 303 F.Supp. 44 (S.D.Tex.1967), *aff'd,* 414 F.2d 34 (5th Cir.1969). Under Tennessee law, to establish a defect in a product, the plaintiff must " 'trace the injury to some *specific error* in *construction* or design of the [product]. . . .' " *Browder,* 541 S.W.2d at 404 (emphasis in original). *See also, Allen, slip op.* at 3; *Gates v. Ford Motor Co.,* 494 F.2d 458, 460 (10th Cir.1974).

All that Mr. Harwell has presented to establish the existence of a defect is that there is a better method of design in the tubing as reflected by Dr. Hill's affidavit. An expert's opinion must be based on a generally accepted theory of explanation that is accepted in the given field of expertise. *See Turpin v. Merrell Dow Pharmaceuticals, Inc.,* 959 F.2d 1349, 1360 (6th Cir.1992); *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188 (6th Cir.1988). An expert's opinion must provide a scientific basis for the opinion. *Turpin,* 959 F.2d at 1360.

In his affidavit, Dr. Hill states that the leak in Mr. Harwell's device could have been prevented if the reservoir had been constructed of polyurethane instead of silicon-elastoner. Yet, Dr. Hill's affidavit does not establish that at the time of the manufacture of the AMSI prosthesis implanted in Mr. Harwell that such a substitution was known to prevent leakage or that it was dangerous to utilize silicon-elastoner. Dr. Pugh's affidavit is undisputed that the AMSI prosthesis in Mr. Harwell represented the state of the art at the time of Mr. Harwell's surgery. Dr. Nesbitt described AMSI's device as the best available on the market. This state of the art represents an affirmative defense to any claim of strict liability or negligence.

Mr. Harwell also has failed to establish an essential element of his product liability claims because he has not shown that the AMS 700CX was under the exclusive control of AMSI prior to its implant into Mr. Harwell. In *Allen,* the Tennessee Court of Appeals denied recovery to the recipient of an AMS penile prosthesis because the plaintiff did not establish that the prosthesis, before implantation, was under the exclusive control of AMS. The Tennessee Court of Appeals stated:

These extensive quotations from the record make it clear that [the prosthesis] was purchased by the hospital and kept as a part of its [inventory] until needed; that the implant was prepared for surgery by soaking it in antibiotic solution, filling it with sterile water removing air bubbles, placing it on a tray, and clamping the tubing of [the prosthesis] with hemostats; that the components came in separate packages which were opened in the operating room and assembled by the doctor during implant; that the components were handled by Dr. Raines and by Collum during the operation and possibly by others; and that there were materials

used in assembly of [the prosthesis], including the fluid which operates the [prosthesis], which were neither manufactured nor provided by AMS. It cannot be said, therefore, that [the prosthesis] reached the Allens in the same condition in which it left AMS.

*Allen, slip op.* at 10.

Here, as in *Allen,* the proof is that the hospital purchased these prosthetic devices and Dr. Nesbitt performed the surgery. Mr. Harwell does not present evidence to show exclusive control over the device by AMSI.

Even if Mr. Harwell's proof were deemed sufficient to show a dangerous product, AMSI, as the manufacturer, invokes the learned intermediary defense. Specifically, AMSI argues that Mr. Harwell's physician, Dr. Nesbitt, is a "learned intermediary" who owed the legal duty to advise him of any risks associated with this prosthetic device.

 Under Tennessee law, a product manufacturer meets its burden if its directions and warnings are to a "learned intermediary" such as a physician. "[T]he duty of [a] manufacturer to warn of dangers involved in use of a product is satisfied if he gives adequate warning to the physician who prescribes it." *Laws v. Johnson,* 799 S.W.2d 249, 252 (Tenn.Ct. App.1990). The learned intermediary doctrine was described in more detail by one court as follows:

> [M]anufacturers [of drugs are required] to provide physicians with warnings which give "adequate notice of possible complications", *Brooks v. Medtronic, Inc.,* 750 F.2d 1227, 1231 (4th Cir.1984); which are "sufficient to put the physician on notice" of possible dangers, *Kinney v. Hutchinson,* 468 So.2d 714, 718 (La. [Ct.] App.1985); which "disclose the nature and extent of the danger", *Perfetti v. McGhan Medical [Co.],* 99 N.M. 645, 662 P.2d 646, 650 (N.M. [Ct.] App.1983); and which "reasonably discloses to the medical profession all risks inherent in the use of the drug which the manufacturer knew or should have known to exist", *Williams v. Lederle Lab[s.],* 591 F.Supp.

381, 384 (S.D.Ohio 1984), *quoting Seley v. G.D. Searle & Co.,* 67 Ohio St.2d 192, 423 N.E.2d 831 (Ohio 1981). By so doing, the cases unanimously hold, the manufacturer satisfies its duty. How the physician communicates the medicine's dangers to the patient is the physician's own decision, and his or her independent duty. There is no legal support for imposing upon a drug manufacturer an "advisory" role in that decision. *Education of the physician, on the one hand, and communication to the patient, on the other, are distinct processes, and the manufacturer's duty involves only the former.* As explained by the court in *Reyes v. Wyeth Laboratories,* 498 F.2d 1264, 1276 (5th Cir.1974), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974);

> Prescription drugs are likely to be complex medicines, esoteric in formula and varied in effect. As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient.... The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

*Polley v. Ciba–Geigy Corp.,* 658 F.Supp. 420, 421–22 (D.Alaska 1987).

 Here, Mr. Harwell cannot establish that AMSI failed to provide proper directions and warnings to Dr. Nesbitt. The affirmative proof is that AMSI made extensive disclosures to Dr. Nesbitt with a specific reference to leakage of the reservoir. Mr. Harwell has not presented proof that Dr. Nesbitt, who selected the device, lacked knowledge of the nature of the device and the precautions attendant to the implant of the device. Such disclosures to Dr. Nesbitt, as a learned intermediary, bar any liability for AMSI.

■ In addition, the Court also concludes that this prosthetic device is an unavoidably unsafe product that contained sufficient warning, and as such, AMSI is not liable to Mr. Harwell for the leakage. In determining whether a prosthesis device, such as the AMS 700CX, is in a "defective condition" or "unreasonably dangerous," courts have relied upon Comment k of Section 402A of the Restatement (Second) of Torts:

k. *Unavoidably Unsafe Products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. *Such a product, properly prepared and accompanied by proper directions and warning, is not defective nor is it unreasonably dangerous.* The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians or under the prescription of a physician.

Restatement (Second) of Torts § 402A comment k (emphasis in original and added).

Several courts have applied Comment k to prescription medical devices. *See McPheron v. Searle Laboratories, Inc.,* 888 F.2d 31 (5th Cir.1989) (IUD); *Phelps v. Sherwood Medical Indus.,* 836 F.2d 296 (7th Cir.1987) (cardiac catheter); *Kirsch v. Picker Int'l, Inc.,* 753 F.2d 670 (8th Cir.), *reh'g denied,* 760 F.2d 183 (8th Cir.1985) (x-ray); *Brooks v. Medtronic, Inc.,* 750 F.2d 1227 (4th Cir.1984) (pacemaker); *Perfetti v. McGhan Medical,* 99 N.M. 645, 662 P.2d 646, 650 (Ct.App.), *cert. denied,* 99 N.M. 644, 662 P.2d 645 (1983) (mammary prosthesis); *Terhune v. A.H. Robins Co.,* 90 Wash.2d 9, 577 P.2d 975 (1978) (Dalkon shield IUD). *See generally,* Annotation, *Products liability: what is an "unavoidably unsafe" product,* 70 A.L.R.4th 16, 88–93 (1989).

Under Comment k, the manufacturer of an unavoidably unsafe product is not liable for injuries arising from the product, if the manufacturer properly designed and manufactured the drug or device and provided adequate warnings on the dangers inherent in the product. *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988). This principle has been applied to a case involving an inflatable penile prosthesis. *Hufft v. Horowitz,* 4 Cal.App. 4th 8, 5 Cal.Rptr.2d 377 (1992).

The Court concludes that Comment k applies to the AMSI prosthesis. Applying Comment k, Mr. Harwell has not established an improper design or manufacture of the prosthesis. Dr. Hill's affidavit shows only a better design, not an improper design. As noted earlier, under Tennessee law, the mere fact that the prosthesis leaked after having performed properly for fourteen months is legally insufficient.

### C. The Warranty Claim

■ As to Mr. Harwell's breach of implied warranty claim, AMSI asserts that Chapter 2 of Tennessee's UCC does not apply to the implantation of an AMS 700CX because an implantation operation does not constitute a sale under Chapter 2. Under the UCC, "[a] 'sale' consists in the passing of title from the seller to the buyer for a price." Tenn.Code Ann. § 47–2–106 (1979). Some courts have held that because substantial labor must be performed in assembling components the provision of those components does not constitute a "sale" within the meaning of UCC Chapter 2. *See, e.g., Milau Assocs., Inc. v. North Avenue Dev. Corp.,* 42 N.Y.2d 482, 398 N.Y.S.2d 882, 368 N.E.2d 1247 (1977).

Other courts have held that the sale of goods incidental to such medical treatment does not constitute a sale under Chapter 2. *See, e.g., Perlmutter v. Beth David Hosp.,* 308 N.Y. 100, 123 N.E.2d 792, 796 (1954). ("When one enters a hospital as a patient, he goes there, not to buy medicine or pills, not to purchase bandages or iodine or se-

rum or blood, but to obtain a course of treatment in the hope of being cured of what ails him."). In *Cutler v. General Elec. Co.*, 4 U.C.C.Rep.Serv. 300 (1967), the court held that "[t]he surgical insertion of the 'Pacemaker' machine by the defendant doctor 'into plaintiff's intestate' while a patient at defendant hospital did not constitute a transaction covered by the Uniform Commercial Code." *Id.* at 301.

"That the property or title to certain items of medical material may be transferred, so to speak, from the hospital to the patient during the course of medical treatment does not serve to make each such transaction a sale.... It has long been recognized that, when service predominates, and transfer of personal property is but an incidental feature of the transaction, the transaction is not deemed a sale within the Sales Act.... 'a contract of sale is not constituted merely by reason that the property in the materials is to be transferred.... If they are simply accessory to work and labour, the contract is for work, labour and materials....'"

*Id.* at 301 (quoting *Perlmutter*, 308 N.Y. at 105, 123 N.E.2d at 794).

To be sure, there are contrary authorities. The Alabama Supreme Court in *Skelton v. Druid City Hosp. Bd.*, 459 So.2d 818 (Ala.1984) held the UCC applicable to goods (suturing needle) used in providing medical services, reasoning as follows:

Article 2 of the Uniform Commercial Code applies, by its terms, to "transactions in goods." Section 7–2–102, Code 1975. That phrase is left undefined by the Code, but a number of courts have held there is significance in the use of the term "transaction" rather than "sale." In light of the statement in the Official Comment to § 7–2–313, that the *warranty sections of Article 2* "need not be confined to sales contracts," we opine our legislature intended that § 7–2–315 be broadly interpreted to include transactions in which there is no actual transfer of title, such as rental and lease transactions. Numerous courts have so held.

. . . .

Therefore, we conclude the transaction here involved is both a service transaction *and* a "transaction in goods...." *Id.* at 821 (citation omitted, emphasis in original).

Similarly, the New Mexico Court of Appeals so held in a surgery implanting an inflatable prosthetic device:

In considering these two questions—the existence of the warranty and its breach—we are not concerned with the absence of any statement by defendant to plaintiff. Any express warranty made with respect to the surgeon would inure to plaintiff's benefit on the basis that the surgeon was acting as plaintiff's agent in the use of the prosthesis.

*Perfetti v. McGhan Medical*, 99 N.M. at 650–51, 662 P.2d 646, 651–52 (citation omitted).

In *Allen*, the Tennessee Court of Appeals reserved judgment on whether to hold that the AMSI penile prosthesis was a "sale" under the UCC. *Allen, slip op.* at 12. The Tennessee Court of Appeals, however, did entertain the plaintiff's breach of implied warranty, but found the proof insufficient. This Court concludes that the *Allen* decision, coupled with *Skelton* and *Perfetti* rationales, support the conclusion that Tennessee courts would consider the sale of implants for surgical purposes to fall under the UCC. Therefore, the provision of the AMS 700CX to the plaintiff for the treatment of his impotence did constitute a sale.

The Tennessee Uniform Commercial Code sets forth the elements of an implied warranty of merchantability. The statute, in pertinent part, states as follows:

Implied Warranty—Merchantability—Usage of Trade. (1) Unless excluded or modified (§ 47–2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind....

(2) Goods to be merchantable must be at least such as:

(a) pass without objection in the trade under the contract description; and

. . . .

(c) are fit for the ordinary purpose for which such goods are used;....

Tenn.Code Ann. § 47–2–314 (1979).

A breach of an implied warranty of fitness for a particular purpose also arises under the following circumstances:

Implied Warranty—Fitness for particular purpose—Exception for certain livestock.—Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose....

Tenn.Code Ann. § 47–2–315 (1991 Supp.).

Mr. Harwell has not produced evidence[3] that the AMS 700CX would not pass without objection in the trade or that it was unfit for the ordinary purposes for which the prosthesis was used. Here, as in *Allen,* the undisputed proof is that the AMSI device represented the state of the art at the time.

In the case of implied warranties of merchantability, the issue is whether the product was fit for the ordinary purpose for which such products are used; for implied warranties of fitness for a particular purpose, whether the product was fit for the particular purpose for which it was bought. In the case of IPP's, the two questions appear to be the same in that the general and specific purposes are one—functional erection of the penis. The skills of creation and implantation of [the prosthesis] are new, and the knowledge is peculiar to the medical profession. Where the product is new, exotic, and usable only through highly trained specialists, a finding as to the expectations of that product without the benefit of expert testimony is suspect in that it is speculative and presumptuous. *Friedman v. Medtronic, Inc.*, 42 App.Div.2d 185, 345 N.Y.S.2d 637, 641 (1973). *Indeed, the only witness presented by plaintiffs who addressed the issue testified that the AMS [prosthesis] was, in March of 1983, the "state of the art" in March of 1983.* Other proof regarding the AMS [prosthesis] generally or this implant specifically is absent from the record of plaintiff's proof. Under these circumstances, the Allens have failed to meet their burden and the trial court erred in not granting AMS's motion for dismissal under T.R.Civ.P. as to claims based on theories of implied warranties.*

*Allen, slip op.* at 12 (emphasis added).

Here, as in *Allen,* the undisputed proof is that the AMSI device represented the state of the art at the time. Dr. Hill, Mr. Harwell's expert, did not dispute Dr. Pugh's affidavit that AMSI's 700CX represented the state of the art. Mr. Harwell used the prosthesis for its ordinary purpose. Accordingly, a breach of implied warranty of fitness is not established here.

For the reasons stated above, the Court grants AMSI's motion for summary judgment.

An appropriate order will be entered.

---

**3.** This finding excludes Harwell's supplemental interrogatory answer and his counsel's affidavit because they contain the hearsay of unsworn complaints to the FDA. Under Rule 56(e), Fed. R.Civ.P., only admissible evidence can be considered on a motion for summary judgment.