Robert TANSY, Appellant,

v.

DACOMED CORPORATION, Appellee.

No. 80662.

Supreme Court of Oklahoma.

Dec. 20, 1994.

---

Kevin L. McClure, Oklahoma City, for appellant.

Richard M. Eldridge, Rhodes, Hieronymus, Jones, Tucker & Gable, Tulsa, for appellee.

SUMMERS, Justice:

Plaintiff's penile implant failed and had to be surgically removed. He brought this products liability suit against the manufacturer. The jury reached a defendant's verdict and the plaintiff appeals, raising three issues for our resolution: (1) whether the jury was properly instructed on the law of "unavoidably unsafe products" as that rule appears in Comment k of the Restatement of Torts, (2) whether evidence of a doctor's prior acts were admissible under 12 O.S. § 2404(B), and (3) whether a witness was properly qualified to testify as an expert. We affirm.

Robert Tansy became impotent due to an adverse reaction to prescription medication for a neurological disorder. He went to a urologist, Dr. Barnes, and after trying several alternatives, decided on a penile implant. Dr. Barnes discussed with Tansy the different implants available. Eventually Tansy and Dr. Barnes decided on the OmniPhase prosthesis because of its cosmetic appeal. The OmniPhase implant was based on new technology and was manufactured and distributed by the defendant Dacomed. The literature on the OmniPhase implant stated that it had a relatively low failure rate as compared to others on the market, and was unique in its design and use of metal cables.

Tansy experienced no difficulty with the implant for a period of time. But less than two years after the implantation of the device, he developed a knot on the side of his penis. Upon returning to Dr. Barnes, it appeared that the cables contained in the prosthetic device had broken, and immediate removal was necessary to prevent further bodily damage. Tansy underwent surgery to remove the prosthesis.

The evidence showed that the cables in the device failed due to fatigue. Apparently the metal cables rub against one another when the device is activated. Over a period of time the cables break. Dacomed was aware of the possibility of cable fatigue. The plaintiff's expert testified that the design was defective, and could have been made safer by using larger cables and by avoiding metal rubbing on metal when it was activated. However, the leading engineer for Dacomed stated that these other options had been tested, and that the one chosen was the best option available under current knowledge.

The evidence also showed that the Omni-Phase implant was an important step forward in penile implant technology, as it was unique in its capability to "impart rigidity or flaccidity on demand." It also had a much lower failure rate than the inflatable type of implant.

The jury was given instructions on the plaintiff's theory of manufacturer's product liability. It was also instructed, over the objection of the plaintiff, as follows:

> If you find that the penile prosthesis manufactured by Dacomed Corporation was unavoidably unsafe, in that it was a prescription medical device which was incapable at the time of manufacture of being made totally safe, it is not unreasonably dangerous if it was marketed with proper directions for use, or included adequate warnings of potential dangers or contraindications.

The jury returned a verdict in favor of Dacomed.

Tansy appealed and the Court of Appeals upheld the jury's verdict, holding that the instruction was appropriate. We granted certiorari to address the "unavoidably unsafe product" question, and now affirm the jury verdict.

### COMMENT K AND ITS APPLICABILITY TO MEDICAL DEVICES

■ Section 402A of the Restatement (Second) of Torts sets forth the elements of products liability. When a manufacturer sells a product in a defective condition which makes it unreasonably dangerous, and the product causes physical harm to the user of the product, the manufacturer can be held responsible for the damage caused if the product reaches the user without substantial change. We adopted manufacturers' products liability in *Kirkland v. General Motors Corporation*, 521 P.2d 1353 (Okla.1974), as a legitimate cause of action in Oklahoma.

The purpose behind manufacturers' products liability is to protect the ultimate consumer from the burden of loss caused by a defective product:

> It is to the public interest to discourage the marketing of products having defects that are a menace to the public. If such products nevertheless find their way into the market it is to the public interest to place the responsibility for whatever injury that may occur upon the manufacturer ... [T]he manufacturer is best situated to provide such protection.

*Kirkland*, 521 P.2d at 1362, quoting *Escola v. Coca–Cola Bottling Co.*, 24 Cal.2d 453, 150 P.2d 436 (1944). The manufacturer is in a position of control over the manufacture and testing of the product. Further, the manufacturer is the party most likely to be capable of handling the financial burden caused by a defective product.

Comment k of Section 402A speaks to products described as "unavoidably unsafe." It seeks to strike a balance between manufacturer responsibility and the encouragement of research and development of new products. In certain instances it is in the public interest to allow products to be marketed which are unsafe, because the benefits of the product justify its risks. Comment k reads as follows:

> k. Unavoidably unsafe products. There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous. The same is true of many other drugs, vaccines and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of

safety, or perhaps even of purity of ingredients, but such experience as there is justified the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

■ While products liability law seeks to protect the public from unreasonably dangerous products, Comment k seeks to protect another facet of the public's interest—that of having available new products whose benefits are great enough as to justify associated risks. It protects certain manufacturers who develop new products which at the time of manufacture are incapable of being made totally safe, and shields certain products by classifying them as "unavoidably unsafe" rather than as "defective." *Hill v. Searle Laboratories,* 884 F.2d 1064 (8th Cir.1989). Public policy favors the development and marketing of new beneficial drugs and devices because they can save lives, reduce pain and improve the quality of life. *Hufft v. Horowitz,* 4 Cal.App.4th 8, 5 Cal.Rptr.2d 377 (4 Dist.1992). "Strict liability might prove to be a dis-incentive to manufacturers to develop and market beneficial drugs because of 'fear of large adverse monetary judgments' and the expense of strict liability insurance, costs that could 'place the cost of medication beyond the reach of those who need it most.'" *Hufft,* 5 Cal.Rptr.2d at 381 quoting *Brown v. Superior Court,* 44 Cal.3d 1049, 245 Cal.Rptr. 412, 751 P.2d 470 (1988).

Most courts which have considered the question have found that Comment k applies to medical devices, especially those which are implanted in the human body. *See Hufft v. Horowitz,* 4 Cal.App.4th 8, 5 Cal.Rptr.2d 377 (4th Dist.Ct.App.1992) and *Harwell v. Amer. Med. Systems, Inc.,* 803 F.Supp. 1287 (M.D.Tenn.1992) (penile prosthesis was protected under Comment k); *Snyder v. Mekhjian,* 244 N.J.Super. 281, 582 A.2d 307 (A.D. 1990) aff'd 125 N.J. 328, 593 A.2d 318 (1991) (blood transfused into patient causing AIDS was covered under Comment k); *Perfetti v. McGhan,* 99 N.M. 645, 662 P.2d 646 (Ct.App. 1983) (Comment k applied to a breast implant); *Allen v. G.D. Searle,* 708 F.Supp. 1142 (D.Ore.1989), *McKee v. Moore,* 648 P.2d 21 (Okla.1982) and *Terhune v. A.H. Robins,* 90 Wash.2d 9, 577 P.2d 975 (1978) (Comment k applied to an IUD); *Phelps v. Sherwood,* 836 F.2d 296 (7th Cir.1987) and *Brooks v. Medtronic Inc.,* 750 F.2d 1227 (4th Cir.1984) (pacemaker and heart catheter covered under Comment k). But see *Hawkinson v. A.H. Robins Co.,* 595 F.Supp. 1290 (D.Colo. 1984) (Dalkon Shield); *Coursen v. A.H. Robins,* 764 F.2d 1329 (9th. 1985) (Dalkon Shield). See 70 A.L.R.4th 16 (1989) for a complete review of these cases. This Court, in *McKee v. Moore,* 648 P.2d 21 (Okla.1982), applied Comment k to an implanted IUD, holding that it may be an "unavoidably unsafe" product under Comment k, and thus not "defective." *Id.* at 23.

In *Hufft v. Horowitz, supra,* and *Harwell v. American Med. Systems, Inc., supra,* penile implants were held to be within the protection of Comment k. The *Hufft* court held that these type of devices "serve the salutary purposes of restoring a degree of normalcy to the lives of those who suffer organic dysfunctions and an impaired quality of life." *Id.* 5 Cal.Rptr.2d at 383.

■ Comment k serves as an affirmative defense when the product is incapable of being made safe under present technology, but the social need for the product warrants its production. *Hill,* 884 F.2d at 1068; *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 837 P.2d 1273 (1992) (pacemaker did not fall under Comment k because it was capable of being made safer at the time of its manufacture). "[T]he design must be as safe as the best available testing and research permits." *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297, 306 (1987) *cert. denied* 485 U.S. 942, 108 S.Ct. 1122, 99 L.Ed.2d 282 (1988). There must be at the time of manufacture and distribution "no feasible alternative design which on balance accomplished the subject product's purpose with a lesser risk." *Id.* 732 P.2d at 306. The manufactur-

ers of the product are held to the knowledge and experience of experts in their fields. *Id.* 732 P.2d at 307; *White v. Wyeth Laboratories, Inc.*, 40 Ohio St.3d 390, 533 N.E.2d 748, 753 (1988); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374, 386–87 (1984) *cert. denied* —— U.S. ——, 112 S.Ct. 3027, 120 L.Ed.2d 898 (1992).[1]

■ The defense is available· only when the product is properly manufactured and contains adequate warnings. *Id.; McPheron v. Searle Laboratories, Inc.*, 888 F.2d 31, 33 (5th Cir.1989); *Harwell v. Amer. Med. Systems, Inc., supra; Allen v. G.D. Searle & Co.*, 708 F.Supp. 1142, 1149 (D.Ore.1989). The Comment k defense does not apply when the product is defective due to faulty manufacturing or inadequate warnings. *Grundberg v. Upjohn Co.*, 813 P.2d 89, 92 (Utah 1991).

Several courts have held that a risk-utility analysis must also be employed before Comment k will bar recovery under products liability. *See Hufft*, 5 Cal.Rptr.2d at 383; *Kociemba v. G.D. Searle*, 680 F.Supp. 1293 (D.Minn.1988); *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987). The benefits of the product must outweigh its risks. *Toner*, 732 P.2d at 306; *Kearl v. Lederle Laboratories*, 172 Cal.App.3d 812, 218 Cal.Rptr. 453 (Div. 4 1985). "This weighing process should consider the value of the benefit, the seriousness of the risk, and the likelihood of both." *Toner*, 732 P.2d at 306, citing *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo.1983). Comment k implicitly, by its language, requires this risk-benefit analysis; the Comment speaks of a product's utility justifying its risks.[2]

■ Following the guidance of our prior case law as well as that of other jurisdictions, we hold that Comment k can apply to medical devices, particularly those which are implanted. The Comment does not provide blanket protection for all medical devices. Rather it applies only as an affirmative defense in those cases in which the following criteria are met: (1) the product is properly manufactured and contains adequate warnings, (2) its benefits justify its risks, and (3) the product was at the time of manufacture and distribution incapable of being made more safe. *See Allen v. G.D. Searle Co.*, 708 F.Supp. 1142, 1149 (D.Ore.1989); *Coursen v. A.H. Robins Co.*, 764 F.2d 1329, 1338 (9th Cir.1985). These issues are generally questions for the jury's determination, and must be determined on a case-by-case basis. *See Coursen*, 764 F.2d at 1338; *Kociemba*, 680 F.Supp. at 1300; *White*, 533 N.E.2d at 752. Because it is an affirmative defense, the defendant bears the burden of proof. *Id.* 680 F.Supp. at 1338.

■ Here, Tansy does not question the proper manufacture of the product. As for the warning requirement, we first note that Oklahoma has adopted the learned intermediary doctrine. *McKee*, 648 P.2d at 24. This doctrine permits a manufacturer to warn the physician, rather than the ultimate consumer, of the problems associated with the product. Here, neither party questions the doctrine's application to the present circumstances. Instead, Tansy urges that the doctor was not given sufficient information to evaluate the product. Tansy claims that Dr. Barnes was given incorrect information regarding the expected lifetime of the OmniPhase prosthesis. Dr. Barnes testified that a Dacomed repre-

---

1. For a complete listing of the states that require there be no safer alternative design, *see* 70 A.L.R.4th at 37.

2. The other jurisdictions which employ a risk-benefit analysis before applying Comment k are Arizona, *Gaston v. Hunter*, 121 Ariz. 33, 588 P.2d 326 (App.1978), Colorado, *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo.1986), Illinois, *Beetler v. Sales Affiliates Inc.*, 431 F.2d 651 (7th Cir.1970), Kansas, *Johnson v. Amer. Cyanamid Co.*, 239 Kan. 279, 718 P.2d 1318 (1986), Michigan, *Dunn v. Lederle Laboratories*, 121 Mich.App. 73, 328 N.W.2d 576 (1982), Missouri, *Racer v. Utterman*, 629 S.W.2d 387 (Mo.1981), New Jer-

sey, *Calabrese v. Trenton State College*, 162 N.J.Super. 145, 392 A.2d 600 (1978), New Mexico, *Davila v. Bodelson*, 103 N.M. 243, 704 P.2d 1119 (App.1985), Texas, *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir.1973) *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1973), and Utah, *Patten v. Lederle Laboratories*, 676 F.Supp. 233 (D.C.Utah 1987). The 5th Circuit, in *Helene Curtis Ind. v. Pruitt*, 385 F.2d 841 (5th Cir.1967), *cert. denied*, 391 U.S. 913, 88 S.Ct. 1806, 20 L.Ed.2d 652 (1967), applied Oklahoma law and determined that Oklahoma would utilize a risk-benefit analysis before applying Comment k.

sentative told him the device would last for 10,000 activations. However, the brochure distributed by Dacomed made no claims as to its expected lifetime and also stated that certain movements of the prosthesis could affect its reliability. The documentation also showed that various complications could require the surgical removal of the device. Although the evidence was conflicting, there was evidence to support the defendant's assertion that adequate warnings were given. It was then a question of fact for the jury to determine. We find that the first criteria for Comment k's application was met.

The next question is whether the product's benefits justify its risks. The OmniPhase prosthesis was a step forward in penile implant technology. Implants on the market before the OmniPhase had failure rates as high as 40%. The studies on the OmniPhase implant revealed a failure rate of between 3.7% and 6%. Furthermore, the cosmetic appearance of other implants required that tight or binding clothing be avoided. The OmniPhase implant permitted a man to wear the trousers of his choice. As stated in *Hufft*, these implants help restore a degree of normalcy to the lives of those who suffer sexual dysfunction. We agree that a jury could reasonably conclude that the benefits of the OmniPhase prosthesis justified the risks associated with its implantation.

As for the last criteria, Tansy argues that the OmniPhase could have been made safer. Dr. Barnes testified that a larger cable could have been used to avoid the cable fatigue. However, the Dacomed engineer testified that a thicker cable was tried, but its results were unsatisfactory because it decreased the ability of the penis to appear flaccid. The engineer also testified that no suitable alternative existed to avoid the "metal rubbing on metal" problem, as no other materials were of sufficient strength. A jury question was thus presented on this, the final criteria applicable.

■ Tansy urges that Comment k does not operate to protect products which are "defective", but only offers protection when the use of the product causes "side effects." He urges that in *McKee v. Moore, supra,* Comment k applied because the product, an IUD, was functioning properly for its intended purpose of preventing pregnancy, but that it caused unwanted side effects. He claims it is only these side effects which were protected by Comment k.

We disagree. First, in *McKee* the facts showed that the IUD had not functioned as intended to prevent pregnancy. Thus, *McKee* lends no support for to Tansy's assertion that "side effects" are protected while "defects" are not. Furthermore, the cases are clear that Comment k is meant to apply when a product is unavoidably unsafe because of a defect. In fact, courts hold that Comment k applies to "re-classify" a product from "defective" to "unavoidably unsafe." *Hill,* 884 F.2d at 1068. As it expressly states, Comment k can apply to all consequences caused by the use of the device. The example used in Comment k illustrates this point. The Rabies vaccine could be considered defective because of its life-threatening side effects. However, it is the intent of Comment k to re-classify this product as unavoidably unsafe so that the public may have access to such a valued and necessary vaccine.

■ As for the instruction given regarding Comment k, the only question remaining is whether the instruction was adequate to inform the jury of the law. We will not reverse a judgment where the instructions when viewed as a whole fairly presented the applicable law as raised by the pleadings and evidence. *Dutsch v. Sea Ray Boats Inc.,* 845 P.2d 187 (Okla.1992); *Root v. Kamo Elec. Co-op Inc.,* 699 P.2d 1083 (Okla.1985). Here Comment k was the basis of the defendant's theory of defense. Since we have held that Comment k is applicable to this particular medical device, the trial court was correct to given an instruction explaining it.

Tansy urges that the instruction did not adequately explain to the jury the legal definition of "unavoidably unsafe." The instruction stated that a product was unavoidably unsafe if it was a "prescription medical device which was incapable at the time of manufacture of being made totally safe...." Although we agree that the instruction could have been worded in more detail, it was

sufficient to apprise the jury of the applicable law. In the future instructions regarding Comment k should include the conditions to its applicability as we have set out in this opinion.

## THE EVIDENCE OF THE DOCTOR'S PREVIOUS IMPLANTATION

■ In his next assignment of error, Tansy asserts that the trial court erred in permitting evidence, over objection, regarding a prior incident in which Dr. Barnes is alleged to have improperly implanted the OmniPhase. Tansy complains that the admission of this evidence was in violation of 12 O.S.1991 § 2404(B). Section 2404(B) reads:

B. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

Dacomed urges that this evidence was admissible as falling within one of the enumerated exceptions of Section 2404(B), namely that of knowledge. Dacomed claims that the evidence showed Dr. Barnes' knowledge of how to determine whether it had been implanted correctly, and knowledge of how to conceal an error.

Character evidence, as mentioned in section 2404, involves a "generalized description of one's disposition in respect to a general trait such as honesty, temperance or carefulness...." Whinery, *Oklahoma Evidence: Commentary on the Law of Evidence,* § 15.03, quoting *Frase v. Henry,* 444 F.2d 1228, 1332 (10th Cir.1971). The restrictions on its admissibility apply in criminal and civil cases. Title 12 O.S.1991 § 2103.[3] Under Section 2404(B), character evidence is dealt with through the application of a specialized relevancy inquiry. *Id.* at 311. Only that evidence of other acts which is relevant for

some reason other than showing action in conformity with character is admissible.

While this Court has not interpreted Section 2404(B), other courts have found that this section permits testimony of other acts to show knowledge in civil cases. McCormick on Evidence, § 197 (4th Ed.1992). For example, in *United States v. O'Brien,* 601 F.2d 1067 (9th Cir.1979), evidence was admitted under Section 404(B) of the Federal Rules of Evidence.[4] The evidence showed continued acceptance by the defendant of state and federal funds to which he was not entitled. The government introduced this evidence in a prosecution for making false statements to the Social Security Administration to rebut the defendant's claims of inadvertent mistake, and asserted that it showed the defendant's *knowledge* that he was making false statements. On appeal the Ninth Circuit upheld the trial court's decision to admit the evidence. In so holding the court stated that before evidence can be admitted under Rule 404(B), the "court must weight its probative value against the potential prejudice." *Id.* at 1070; *see also United States v. Bi–Co Pavers, Inc.,* 741 F.2d 730 (5th Cir. 1984).

In *Gutierrez–Rodriguez v. Cartagena,* 882 F.2d 553 (1st Cir.1989), the First Circuit was asked to resolve the question of whether evidence of prior complaints against a police officer were admissible during a trial in which the officer was sued for civil rights violations. The court relied on a two part test to make its decision: (1) was the evidence of prior bad acts introduced for a legitimate purpose, and (2) should it be suppressed because of substantial prejudice? The court held that the evidence was admissible not to show the tendencies of the defendant, but to show that his supervisors had *knowledge* of his poor performance record. *See also In re Air Crash in Bali,* 684 F.2d 1301 (9th Cir.1982) *cert. denied* 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989) (evidence of a pilot's prior poor flight record was

---

3. Section 2103 states in relevant part "this Code shall apply in both criminal and civil proceedings, conducted by or under the supervision of a court ..."

4. Federal Rules 404(B) is substantially similar to our Oklahoma Rule 2404(B).

admissible to show that the airline had notice of pilot's inabilities).[5]

In this case Dacomed asserts that the evidence was introduced to show the doctor's knowledge of how to insert the device, how to determine whether it was correctly implanted and how to disguise any professional error. One of Dacomed's theories was that the failure of the OmniPhase was due to an incorrect implantation by Dr. Barnes. In the prior implantation Dacomed had requested, and Dr. Barnes had taken, x-rays of the prosthesis before removal. Dacomed's witness testified that it required such x-rays before removal or the warranty would not be honored. Those x-rays in the other case had revealed that one of the pieces of the prosthesis had been implanted upside down, and had caused the device to fail.

In Tansy's case, Dr. Barnes failed to take x-rays before removal as requested by Dacomed. These x-rays would have shown whether the device was correctly implanted. Dacomed's introduction of the prior incident was argued to be relevant to show that Dr. Barnes knew Dacomed's procedure of requiring x-rays before removal of the device, and knew that if the device had been improperly implanted, failure to take x-rays would have eliminated evidence of such mistake. Dr. Barnes claimed that he did not take x-rays because after his examination of Tansy, he thought it was obvious that the cable had broken, and that immediate removal was necessary. He stated that he saw no need for the additional time or cost in taking an x-ray. When the implant was removed, Dr. Barnes'

diagnosis of a broken cable proved to be correct.

Under *Gutierrez–Rodriguez*, we first look to whether the admission of this evidence was for a legitimate purpose and showed something other than propensity. In our case this is a difficult and very close question. We conclude Dacomed had reason to seek admission of the evidence to show that Dr. Barnes was familiar with the procedures required by Dacomed for removal of the Omni-Phase. The prior incident shows that Dr. Barnes had been faced with a problem with the OmniPhase before the incident with Tansy, and had been instructed to take x-rays of the device while it remained implanted. The Doctor's knowledge of Dacomed's requirements are thus relevant to this theory of Dacomed.

■ The second part of the test is a balancing test very similar to that under Section 2403.[6] We must determine whether the probative value of the evidence outweighs its prejudicial effect. Our concern is that the evidence could have been improperly interpreted by the jury to show a propensity on the part of the doctor to implant these improperly, and to cover up such mistake. As the reviewing court, however, we will not overturn the trial court's ruling under Section 2403 unless there is a clear abuse of discretion. *See Gabus v. Harvey*, 678 P.2d 253, 256 (Okla.1984); *Jones v. Stemco Mfg. Co.*, 624 P.2d 1044 (1981). The evidence was relevant; there was also a risk of prejudice with regard to the jury. But we do not find

5. The separate opinion concurring in part and dissenting in part urges that this case does not involve "character evidence" so as to require application of § 2404(B). For other cases applying this provision of the evidence code in civil cases under circumstances analogous to ours, See. e.g. *Lee v. Hodge*, 882 P.2d 408 (Ariz.1994) (trial court did not abuse its discretion in refusing evidence which showed that a automobile repair shop acted with knowledge, intent and a motive in causing extra damage to vehicles in order to raise repair costs); *Boettcher & Co. v. Munson*, 854 P.2d 199 (Colo.1993) (evidence was admissible under Rule 404(b) in a civil case to show the plan and intent of recommending unsuitable investments in order to defraud the investors); *Jay Edwards, Inc. v. New England Toyota Distrib., Inc.*, 708 F.2d 814 (1st Cir.1983) (evidence was admissible under Rule 404(B) to

show retaliatory practices); *Crowston v. Goodyear Tire and Rubber Co.*, 521 N.W.2d 401 (N.D. 1994) (testimony was admissible in a products liability case under the character evidence provisions to show that plaintiff most likely did not have knowledge of the warnings by reading them); *Eaves v. Penn*, 587 F.2d 453 (10th Cir. 1978) (evidence was admissible under character evidence provision to show intent to defraud in a civil case dealing with breach of fiduciary duty).

6. 12 O.S.1991 § 2403

   Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise.

an abuse of discretion in allowing the testimony.[7] There was no other evidence that *this* implantation by Dr. Barnes was incorrect, and the jury clearly observed that the device failed because a cable broke.

## THE EXPERT WITNESS

As his final assignment of error, Tansy claims that it was error to permit the Director of Clinical and Regulatory Affairs of Dacomed to testify as an expert "medical" and "engineering" witness. Mary Wilen, the Director, is a licensed practical nurse. She worked as a nurse for several years, and was later employed as a research nurse to carry out clinical studies. At Dacomed, her duties include setting up clinical studies and selecting doctors to be in those studies. She was involved in the clinical study conducted on the OmniPhase prosthesis, and has extensive experience in conducting clinical research. She was also the person who handled any problems presented by doctors during or after the implantation of the device.

At trial Wilen testified that on an occasion prior to Tansy's, Dr. Barnes had implanted an OmniPhase device incorrectly. In her testimony, she explained how the device should be implanted. She testified as to the ordinary procedures followed by Dacomed when there is a complaint. Lastly, she testified as to how the clinical studies were conducted, and that the studies showed a 3.77% fail rate with the OmniPhase.

The statements made by Wilen were within her base of knowledge and expertise. She did not testify as to the proper engineering or designing of the prosthesis. She simply testified to facts and opinions that were within her realm of knowledge as the Director of Clinical Affairs.

The trial court's decision regarding the qualifications of an expert will not be reversed unless there is a clear abuse of discretion. *Gabus*, 678 P.2d at 257. The trial court gave the jury an instruction which stated that the weight to give expert testimony was entirely up to the jury. The jury was aware of her qualifications and of her position within Dacomed. They could give her testimony whatever weight they determined appropriate. Again, we find no abuse of discretion in allowing her to testify.

## CONCLUSION

The opinion of the Court of Appeals is vacated, although we reach the same conclusion reached there. The judgment for Defendant rendered in the District Court based on the jury verdict is affirmed.

LAVENDER, V.C.J., and HARGRAVE, OPALA, ALMA WILSON and WATT, JJ., concur.

HODGES, C.J., and KAUGER, J., concur in result.

SIMMS, J., concurs in part, dissents in part.

SIMMS, Justice, concurring in part, dissenting in part:

I respectfully dissent to that portion of the majority opinion dealing with evidence of previous implantations by the doctor being admissible as character evidence. I fear the majority opinion may be misleading as Dr. Barnes's character is not an issue in this case. Neither is his propensity to err while implanting prosthetic devices. The witness's testimony has to be judged by the standard of relevance set out in section § 2401. I believe that the questioned testimony was, at best, barely relevant. Tansy has not shown any prejudice resulting from its admission, however, and for that sole reason the trial court's ruling should be affirmed. The majority's treatment of this question appears certain to cause confusion in later decisions involving evidentiary rulings, as it unnecessarily discusses issues which are not presented by the facts of this case.

---

7. We note that the parties did not request, nor did the trial court give, a limiting instruction with regard to this evidence. In some instances, a limiting instruction is given to explain to the jury that the evidence may not be considered to show propensity, but can be used to show knowledge, intent, motive, opportunity, plan, preparation identity or absence of mistake or accident. *See* 12 O.S.1991 § 2404(B). Because the parties did not raise this issue, we do not address it.

Title 12 O.S.1991 § 2404 provides that evidence of a person's character is *not* admissible in evidence except when a criminal defendant puts his character in issue; as evidence by an accused in a criminal case, or by the prosecution to show either aggressiveness or peacefulness of a victim of a crime on the question of who was the aggressor. Sections 2607 and 2608 deal with attacking the credibility of a witness through character evidence. Section 2609 addresses the impeachment of a witness by evidence of conviction of crime. The last three mentioned sections of the evidence code are referred to in § 2404(A)(3). As the majority acknowledges, there is no civil case, as distinguished from criminal case, in Oklahoma dealing with prior activities of a party or a witness under the rubric of "character evidence".

From an evidentiary standpoint, what we deal with in this case is the question of admissibility of other acts of a person as imputing knowledge. This type of evidence is admissible under § 2404(B) of the evidence code. Section B clearly states that this evidence is not admissible to prove character, but may be admitted to establish, inter alia, knowledge of, or absence of, mistake or accident.

Admissibility of prior acts, as addressed by our Evidence Code, is neither new nor novel to Oklahoma jurisprudence. In *Kurn v. Radencic*, 193 Okla. 126, 141 P.2d 580 (1943) this Court recognized that it is the general rule that proof of "an act charged against a person may not be proved by showing a like previous act to have been committed by the same person." (Citations Omitted) However, the court went on to point out that there are many instances where proof of acts or similar misconduct is permitted because such evidence may have a bearing on some phase of the case. In concluding that such evidence had a bearing on the issue of knowledge, the court stated: "Thus in each class of cases when the question of inquiry into collateral matters is presented and it is sought to establish a rule, opposing considerations must be weighed and the value of the proposed evidence on the issue or phase of issue must be weighed against the normal objections that arise in connection therewith. A

certain amount of discretion may be and is, in some instances and respects, vested in trial tribunals". *Id.* 141 P.2d at 582. In *Kurn,* evidence of other acts was admitted under a cautionary admonition by the trial judge to the jury.

For example, in *Hackbart v. Cincinnati Bengals Inc, and Charles "Booby" Clark,* (10th Cir.1979) 601 F.2d 516, the Tenth Circuit in addressing other violent acts by football players, observed at *Id.* at P. 525, "The other aspect, namely the proof of *character* of the plaintiff by production of prior acts, would be admissible only if his *character* was an issue in the case. Unless the plaintiff was shown to have been an unlawful aggressor in the immediate incident, his prior acts could not be relevant. The indications from the picture of the action here are that he threw a body block and after the lapse of * * * a short period of time, the blow was struck while Hackbart was down on his knee watching the action. Therefore, this evidence would appear to be questionable if not irrelevant." (Emphasis added)

The majority opinion misinterprets this dissenting in part writing. We do not say the evidence code is inapplicable to the questioned evidence in this case. We simply point out that § 2404 addresses two separate types of evidence. Subsection A deals with the admissibility of character evidence, while Subsection B addresses the subject of evidence of "other acts". These are separate and distinct types of evidence. The cases cited by the majority in footnote 3 of its opinion do not support the conclusion that evidence of "other acts" is admissible as evidence of "character". *Lee v. Hodge,* supra, the Arizona case, addresses the admissibility of evidence of other *acts* of damage to customers cars while being repaired in defendant's shop. *Boettcher & Co. v. Munson,* supra, dealt with other *acts* committed in defendant's course of business as bearing on the intent to defraud an investor. This was discussed under the provisions of our § 2404(B). *Jay Edwards, Inc. v. New England Toyota Distrib., Inc.,* supra, also presents the question of prior *acts* of a defendant to show retaliatory practices per our § 2404(B).

In *Crowston v. Goodyear Tire & Rubber,* supra, the court permitted evidence of a per-

sonality disorder which would bear on a plaintiff's ability to read a warning, but the court specifically *excluded* character evidence. Also, in the Tenth Circuit case of *Eaves v. Penn,* supra, evidence of other allegedly improper *acts* were properly admitted as proving motive, opportunity or intent. We do not urge, as the majority implies, that evidence of other acts are never admissible in a civil action.

Dr. Barnes's character is not at issue. The majority's failure to distinguish between evidence of other acts which might bear on the issue of knowledge and "character evidence" is ill advised.

OPALA, Justice, concurring.

The court affirms today the judgment on jury verdict for the defendant-manufacturer, holding that Comment k,[1] Restatement (Second) of Torts § 402A,[2] applies to medical devices, including penile prostheses,[3] which are implanted in the body. Comment k, which deals with *unavoidably unsafe* appliances, affords an affirmative defense against products liability claims where the manufacturer demonstrates that (1) the medical device is properly manufactured and contains adequate warnings, (2) its benefits justify its risks and (3) at the time of its production and distribution, the device was incapable of safer manufacture.[4]

While I concur in today's judgment and in the court's opinion, I write separately to explain that the elements *likely to be embodied* in Restatement (Third) of Torts[5] would significantly modify Comment k jurisprudence.

1. The pertinent portions of Comment k, RESTATEMENT (SECOND) OF TORTS, are:

    "k. *Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, *are quite incapable of being made safe for their intended and ordinary use....* Such a product, *properly prepared, and accompanied by proper directions and warning,* is *not* defective, *nor is it unreasonably dangerous....* The seller of such products, *again with the qualification that* they are properly prepared and marketed, and *proper warning is given,* where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently *useful and desirable product, attended with a known but apparently reasonable risk."* (Emphasis added.)

2. Section 402A, RESTATEMENT (SECOND) OF TORTS, states in pertinent part:

    "(1) One who sells any product in a defective condition *unreasonably dangerous* to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property...." (Emphasis added.)

3. *See Harwell v. Amer. Med. Systems, Inc.,* 803 F.Supp. 1287, 1300 (M.D.Tenn.1992).

4. *See Allen v. G.D. Searle & Co.,* 708 F.Supp. 1142, 1149 n. 1 (D.Or.1989); *Coursen v. A.H. Robins Co.,* 764 F.2d 1329, 1337 (9th Cir.1985).

5. *See* Products Liability, § 8, Council Draft No. 2. The American Law Institute (ALI) has undertaken the process of drafting the RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY. James A. Henderson, Professor, Cornell Law School, and Aaron D. Twerski, Professor, Brooklyn Law School, have been selected as reporters for the project. Several drafts of the third Restatement have been released: a preliminary draft in April 1993; Council Draft No. 1 in September 1993. The most recent version (and the one discussed here), Council Draft No. 2, was released September 2, 1994. Each distribution has spawned debate and discussion among the commentators. *See, e.g.,* Roland F. Banks, Margaret O'Connor, *Restating the Restatement (Second), Section 402A—Design Defect,* 72 OR.L.REV. 411 (1993); Harvey L. Kaplan, Scott W. Sayler, Steven M. Thomas, *Third Restatement: New Prescription for Makers of Drugs and Medical Devices,* 61 DEF. COUNS.J. 64 (1994); *see also* James A. Henderson, Jr., Aaron D. Twerski, *Will A New Restatement Help Settle Troubled Waters: Reflections,* 42 AM. U.L.REV. 1257 (1993); James A. Henderson, Jr., Aaron D. Twerski, *A Proposed Revision of Section 402A of the Restatement (Second) of Torts,* 77 CORN.L.REV. 1512 (1992); Peter Nash Swisher, *Products Liability Tort Reform: Why Virginia Should Adopt The Henderson–Twerski Proposed Revision of Section 402A, Restatement (Second) of Torts,* 27 U.RICH.L.REV. 857 (1993). For a cogent analysis of the RESTATEMENT (THIRD)'s modification of Comment k jurisprudence on drugs and medical devices, see Teresa Moran Schwartz, *Prescription Products and the Proposed Restatement (Third),* 61 TENN.L.REV. 1357, 1369–1377 (1994).

    The terms of § 8, Council Draft No. 2, state in pertinent part:

    "§ 8. Liability of Seller or Other Distributor for Harm Caused by Prescription Drugs and Medical Devices

    (a) A manufacturer of a prescription drug or *medical device* who sells or otherwise distributes a defective product is subject to liability for harm to persons caused by the product defect. A prescription drug or *medical device* is one that may be legally sold or other-

# I

## SECTION 8 OF THE PROPOSED RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY MODIFIES *COMMENT K* JURISPRUDENCE WHILE RETAINING ITS BASIC ELEMENTS

Section 8(a), which embodies a general statement of liability for manufacturers of prescribed defective drugs or medical devices,[6] would explicitly subject medical devices to the black letter rule of § 402A. It would replace the § 402A category of "unreasonably dangerous" products with a new rubric called "not reasonably safe."[7] According to § 8(c) and (d), a medical device may be *not reasonably safe* (a) "due to *defective design*" or (b) "because of *inadequate instructions or warnings.*"[8]

A medical device is *not reasonably safe because of a design defect* when the foreseeable risk of harm posed by it is sufficiently great in relation to its prospective benefits that no reasonable health care provider, knowing those risks/benefits, would prescribe the device for any class of patients.[9] This wording represents a modification of the previous *risk-utility analysis* alluded to in Comment k and developed largely by extant jurisprudence.[10] The § 8 risk-utility approach is considerably *more rigorous* than that of its predecessor. Yesteryear's "unavoidably unsafe" device must now have *so little merit compared with its attendant benefits* that *no reasonable health care provider* would prescribe it to any patient class.[11] The drafters justify this change in deference to the regulated market for medical devices and by giving proper weight to the intercession of professional judgment by learned intermediaries.[12]

Under § 8(d) of the current draft, a medical device is *not reasonably safe because of inadequate instructions or warnings* when reasonable instructions or warnings are *not* given *to the prescribing and/or other health care providers* who may be in a position to reduce the risks of harm posed by the defective product.[13] This sentence articulates the so-called "learned intermediary rule" that de-

wise distributed *only pursuant to a health care provider's prescription.*
(b) For purposes of liability under Subsection (a), a product is defective if at the time of sale or distribution:
\* \* \* \* \* \*
(2) the drug or medical device is not reasonably safe due to *defective* design or because of inadequate instructions or warnings.
(c) A drug or medical device is *not reasonably safe* due to defective design when the foreseeable risks of harm posed by the drug or medical device *are sufficiently great in relation to* its foreseeable therapeutic benefits so that no reasonable health care provider, knowing of such foreseeable risks and therapeutic benefits, would prescribe the drug or medical device *for any class of patients.*
(d) A drug or medical device is *not reasonably safe because of inadequate instructions or warnings* when
(1) reasonable instructions or warnings regarding foreseeable risks of harm posed by the drug or medical device are not provided *to prescribing and other health care providers* who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or
(2) reasonable instructions or warnings regarding foreseeable risks of harm posed by the drug or medical device are not provided *directly to the patient* when the manufacturer

knew or had reason to know that no health care provider would be in the position described in Subsection (d)(1)." (Emphasis added.)

6. For the terms of § 8(a), RESTATEMENT (THIRD), see *supra* note 5.

7. For the terms of § 8(b)(2), RESTATEMENT (THIRD), see *supra* note 5.

8. *See* § 8(c) and (d)(1), RESTATEMENT (THIRD), *supra* note 5.

9. *See* § 8(c), RESTATEMENT (THIRD), *supra* note 5.

10. *See* Reporter's Note, Comment g, § 8, RESTATEMENT (THIRD), *supra* note 5, citing *Tobin v. Astra Pharmaceutical Prods., Inc.*, 993 F.2d 528, 536–537 (6th Cir.1993), *cert denied sub nom, Duphar v. Tobin*, —— U.S. ——, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993).

11. *See* Comment b, RESTATEMENT (THIRD) OF TORTS: PRODUCTS LIABILITY (Council Draft No. 2, September 4, 1994).

12. *Id.*

13. *See* § 8(d)(1), RESTATEMENT (THIRD), *supra* note 5.

fines a manufacturer's Comment k duty to warn.[14]

The new text (§ 8) would *now* acknowledge an exception to the "learned intermediary rule". A medical device may be "not reasonably safe" because of inadequate instructions or warnings where none is provided *directly to the patient-user* (although the manufacturer knew or had reason to know that *no* health care provider would be available to receive the vicarious warnings expected by the "learned intermediary rule").[15] The draft change reflects the trend of modern jurisprudence which has weakened the otherwise impregnable shield of the once all-exclusive "learned intermediary rule".[16]

## II

### SECTION 8 WOULD ABROGATE THE AFFIRMATIVE DEFENSE CONCEPT OF COMMENT K AND PLACE ON THE PLAINTIFF THE *ONUS* OF PROVING THE DEVICE *NOT REASONABLY SAFE*

Mainstream products liability jurisprudence, just as today's pronouncement, generally interprets Comment k to create a manufacturer's *affirmative defense.*[17] Section 8 would dramatically depart from this concept. It would transfer the burden of proof *in its entirety* to the plaintiff-user of the device. Its text mirrors the approach taken in those jurisdictions which require *a high threshold test before* liability may be deemed established at the summary judgment stage of the case.[18] In short, § 8 would reallocate the affirmative-defense regime spawned by Comment k and relieve the manufacturer of its present burden to show that the device falls within an exception to liability.

## III

### CONCLUSION

Currently debated changes in § 402A—reflected in Council Draft No. 2, Restatement (Third) of Torts: Products Liability, § 8—generally track the *current trends* in "unavoidably unsafe" products jurisprudence. The next Restatement is more than likely to embrace *different standards* of producers' liability for defective medical devices. The presently proposed § 8 draft retains all basic Comment k elements, but would tighten the risk/benefit analysis as well as create an exception to the "learned intermediary rule". Taking the path lit by case law from several jurisdictions, the drafters would cast on the plaintiff the *entire* burden of proving that a medical device is "not reasonably safe." This would *discard* Comment k's present-day allocation-of-proof regime that now casts the *onus probandi* on manufacturers.[19]

While not in complete accord with some evolving jurisprudential trends and with the intellectual underpinnings likely to influence the *next* Restatement, today's opinion is entirely consistent with the mainstream of present-day Comment k case law. I hence concur.

---

**14.** *McKee v. Moore,* Okl., 648 P.2d 21, 24 (1982).

**15.** For the pertinent provisions of § 8(d)(2), RESTATEMENT (THIRD), see *supra* note 5. The Reporter's Note, Comment e (direct warning to patients), explains that many of the cases in this category deal with vaccines administered *en masse* at public health clinics, citing *Givens v. Lederle,* 556 F.2d 1341 (5th Cir.1977) (applying Florida law); *Reyes v. Wyeth Labs.,* 498 F.2d 1264 (5th Cir.1974) (applying Texas law); *Davis v. Wyeth Labs.,* 399 F.2d 121 (9th Cir.1968) (applying Idaho law). For a criticism of the inclusion of these cases in the Reporter's Note, see *Kaplan, supra* note 5.

**16.** Reporter's Note, Comment g, § 8, RESTATEMENT (THIRD), *supra* note 5; *Tobin, supra* note 10, 993

F.2d at 536–537; *Reyes, supra* note 15, 498 F.2d at 1277; *Givens, supra* note 15, 556 F.2d at 1345.

**17.** *Hill v. Searle Laboratories,* 884 F.2d 1064, 1068 (8th Cir.1989); *Larsen v. Pacesetter Systems, Inc.,* 74 Haw. 1, 837 P.2d 1273, 1285–1286 (1992).

**18.** *See* Reporter's Note, Comment f, § 8, RESTATEMENT (THIRD), *supra* note 5, citing *Williams v. Ciba–Geigy Corp.,* 686 F.Supp. 573, 577–579 (W.D.La.1988), *aff'd,* 864 F.2d 789 (5th Cir. 1988).

**19.** Reporter's Note, Comment f, § 8, RESTATEMENT (THIRD), *supra* note 5.