Aimee Freeman, appellant, v. Hoffman-La Roche, Inc.,
a corporation, appellee.

618 N.W. 2d 827

Filed October 27, 2000.    No. S-98-1095.

Jeffrey A. Silver for appellant.

Jill Vinjamuri and Michael G. Connery, of Kutak Rock, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

In this appeal, we reconsider our approach to products liability for defects in prescription drugs in light of changes in the law and the release of Restatement (Third) of Torts: Products Liability §§ 1 to 21 (1997) (Third Restatement). The appellant, Aimee Freeman, filed a petition alleging seven theories of recovery against the appellee pharmaceutical company, Hoffman-La Roche, Inc. (Hoffman). She seeks damages for injuries she sustained following her use of the prescription drug Accutane. Hoffman demurred on the basis that the petition failed to state a cause of action. Based on our decision in

*McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 241 N.W.2d 822 (1976), the district court dismissed with leave to amend in order to allow Freeman to plead facts that at the time Accutane was approved by the U.S. Food and Drug Administration (FDA), Hoffman committed fraud as part of the approval process. Freeman stood on her petition, and the action was dismissed with prejudice.

## I. BACKGROUND

Freeman's operative petition alleged the following facts: On or about September 23, 1995, Freeman presented herself to her physician for treatment of chronic acne. After examination, her physician prescribed 20 milligrams daily of Accutane. Hoffman is the designer, manufacturer, wholesaler, retailer, fabricator, and supplier of Accutane.

Freeman took the Accutane daily from September 27 through October 2, 1995, and from October 4 through November 20, 1995. Hoffman alleged that as a result of taking the Accutane, she developed multiple health problems. These problems included ulcerative colitis, inflammatory polyarthritis, nodular episcleritis OS, and optic nerve head drusen. As a result, Freeman alleged that she sustained various damages. Freeman alleged that the Accutane she took was defective, misbranded, and mislabeled. She alleged that Hoffman knew that Accutane was dangerous and/or posed significant health risks and that despite this knowledge, Hoffman misled the medical community and their patients with incomplete information regarding its safety by failing to disclose the side effects that Freeman suffered. She also alleged that Hoffman made misrepresentations regarding the safety and effectiveness of Accutane in order to induce medical providers to select Accutane instead of other available drug options. According to Freeman, she and her physician relied upon these misrepresentations.

Freeman alleged seven theories of recovery, the details of which are set out further in the analysis sections of this opinion: (1) strict liability on the bases that Hoffman distributed Accutane when it was not fit for its intended purpose and when the inherent risks outweighed the benefits of its use, and because it was unreasonably dangerous; (2) negligence on the bases that

Hoffman performed negligent and careless research, testing, design, manufacture, and inspection of the product and failed to give adequate warnings of the risks of its use; (3) misrepresentation on the basis that Hoffman falsely represented to Freeman that Accutane was safe to use, thus inducing her to use the product; (4) failure to warn; (5) breach of implied warranty; (6) breach of express warranty; and (7) fear of future product failure on the basis that the actions of Hoffman caused Freeman to suffer mental distress and anxiety.

## II. ASSIGNMENTS OF ERROR

Freeman assigns that the district court erred in sustaining Hoffman's demurrer and in dismissing the petition with prejudice.

## III. STANDARD OF REVIEW

In reviewing an order sustaining a demurrer, an appellate court accepts the truth of the facts which are well pled, together with the proper and reasonable inferences of law and fact which may be drawn therefrom, but does not accept conclusions of the pleader. *Prokop v. Hoch*, 258 Neb. 1009, 607 N.W.2d 535 (2000).

In determining whether a cause of action has been stated, the petition is to be construed liberally. If as so construed the petition states a cause of action, a demurrer based on the failure to state a cause of action is to be overruled. *Danler v. Rosen Auto Leasing*, 259 Neb. 130, 609 N.W.2d 27 (2000); *Cobb v. Sure Crop Chem. Co.*, 255 Neb. 625, 587 N.W.2d 355 (1998).

If from the facts stated in the petition it appears that the plaintiff is entitled to any relief, a general demurrer will not lie. *Fox v. Metromail of Delaware*, 249 Neb. 610, 544 N.W.2d 833 (1996).

## IV. ANALYSIS

Freeman contends that she has stated a cause of action for products liability under a variety of theories of recovery. Before proceeding, we believe it helpful to set forth a brief history of the general principles of products liability law and its development since the adoption of Restatement (Second) of Torts § 402 A (1965) (Second Restatement).

■ In products liability litigation, the notion of a defective product embraces two separate concepts. The first, commonly labeled as a manufacturing defect, is one in which the product differs from the specifications and plan of the manufacturer. The second concept of a defective product is one in which the product meets the specifications of the manufacturer but the product nonetheless poses an unreasonable risk of danger. This condition is generally characterized as a design defect. See *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987). A manufacturer may also be liable for a failure to warn. *Id.*

■ In products liability cases, there is a significant distinction between a manufacturer's liability as the result of negligent manufacture and its liability for the manufactured product on account of strict liability in tort. In a cause of action based on negligence, the question involves the manufacturer's conduct, that is, whether the manufacturer's conduct was reasonable in view of the foreseeable risk of injury; whereas in a cause of action based on strict liability in tort, the question involves the quality of the product, that is, whether the product was unreasonably dangerous. *Id.* See, also, *Ortho Pharmaceutical Corp. v. Heath*, 722 P.2d 410 (Colo. 1986), *overruled on other grounds, Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo. 1992) (describing types of defective product claims).

For organizational purposes, we address Freeman's allegations of product defects in terms of the defects which she attempts to allege: design, manufacturing, and warning.

### 1. DESIGN DEFECT

In her operative petition, Freeman alleges that Hoffman is strictly liable for her injuries on the bases that Accutane was not fit for its intended purpose, that the risks inherent in the design outweighed the benefits of its use, and that Accutane was more dangerous to Freeman than was anticipated due to undisclosed side effects. As facts supporting her allegations, Freeman alleges that Accutane is sold as an acne medication and that the side effects of Accutane present life-threatening conditions. Thus, Freeman's petition asserts that Hoffman is liable on the basis of a design defect. Hoffman, however, alleges that because Accutane was approved by the FDA, it is exempted from liability for a

design defect pursuant to our decision in *McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 241 N.W.2d 822 (1976).

### (a) Second Restatement § 402 A

■ In dealing with products other than prescription drugs, this court has recognized a manufacturer's liability in tort for design defects. Liability arises when an article a manufacturer has placed in the market, knowing that it is to be used without inspection for defects, proves to have a defect which causes an injury to a human being rightfully using the product. *Rahmig, supra.* We have also adopted and applied the test set out in the Second Restatement § 402 A. See *Rahmig, supra.*

Section 402 A at 347-48 provides:

(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(2) The rule stated in Subsection (1) applies although

(a) the seller has exercised all possible care in the preparation and sale of his product, and

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

Comment *i.* at 352 provides that the rule stated in § 402 A applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer. . . . The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.

This is commonly referred to as the "consumer expectations test." See Annot., 73 A.L.R.5th 75 (1999).

In *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987), we discussed criticisms of the consumer expectations test as embodied in § 402 A and the application in other jurisdictions of a risk-utility test in determining whether a product is unreasonably dangerous. We noted, however, that the issue of whether to adopt a risk-utility test was not before us. We then specifically overruled cases indicating that a plaintiff must present evidence of a reasonable alternative design in cases involving design defects.

Since *Rahmig*, we have applied the consumer expectations test for strict liability. See, e.g., *Haag v. Bongers*, 256 Neb. 170, 589 N.W.2d 318 (1999). Under this test, " '[u]nreasonably dangerous' means that a product has the propensity for causing physical harm beyond that which would be contemplated by the ordinary user or consumer who purchases it, with ordinary knowledge common to the foreseeable class of users as to its characteristics." *Id.* at 184, 589 N.W.2d at 329. Thus, in regard to nonprescription drug products, we have generally followed the rule as set out in § 402 A of the Second Restatement. Prescription drugs, however, have been treated differently both by this court and by the Second Restatement.

*(i) Comment* k. *Exception for Unavoidably Unsafe Products*
Under the Second Restatement, prescription drugs are treated specially under § 402 A, comment *k*. Comment *k*. at 353-54 provides an exception from strict liability when a product is deemed to be "unavoidably unsafe" and states:

> There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. An outstanding example is the vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequences when it is injected. Since the disease itself invariably leads to a dreadful death, both the marketing and the use of the vaccine are fully justified, notwithstanding the unavoidable high degree of risk which they involve. Such a product, properly prepared, and accompanied by proper directions and warning, is not defective, nor is it *unrea-*

*sonably* dangerous. The same is true of many other drugs, vaccines, and the like, many of which for this very reason cannot legally be sold except to physicians, or under the prescription of a physician. It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Application of comment *k.* has been justified under the law in some jurisdictions as a way to strike a balance between a manufacturer's responsibility and the encouragement of research and development of new products. Under certain instances, it is in the public interest to allow products to be marketed which are unsafe, because the benefits of the product justify its risks. See, *Hill v. Searle Laboratories*, 884 F.2d 1064 (8th Cir. 1989) (describing policy considerations); *Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla. 1994).

We applied § 402 A, comment *k.*, to a products liability action involving a prescription drug in *McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 241 N.W.2d 822 (1976). In *McDaniel*, a woman was rendered permanently comatose after being given doses of a prescription drug, Innovar, during surgery. At the time of her surgery, Innovar and the warnings and information contained in the package inserts had been approved for use by the FDA. At trial, it was contended that the manufacturer was negligent in failing to warn, strictly liable under § 402 A of the Second Restatement, and liable under a theory of either express or implied warranty. The trial court submitted the issue of negligence to the jury but did not submit the issue of strict liability or warranty to the jury. On appeal, we

placed emphasis on FDA approval of the drug, and citing to § 402 A, comment *k.*, we held:

> An unavoidably unsafe drug which has been approved for marketing by the United States Food and Drug Administration, properly prepared, compounded, packaged, and distributed, and accompanied by proper approved directions and warnings, as a matter of law, is not defective nor unreasonably dangerous, in the absence of proof of inaccurate, incomplete, misleading, or fraudulent information furnished by the manufacturer in connection with such federal approval or later revisions thereof.

*McDaniel,* 196 Neb. at 201, 241 N.W.2d at 828. Under the evidence presented, we determined that it was not error for the trial court to refuse to submit the issue of strict liability or warranty, either express or implied, to the jury.

### (ii) Interpretation of Comment k. in Other Jurisdictions

Comment *k.*, however, has been interpreted in a variety of ways in other jurisdictions, and there has been a wide range of disagreement regarding its application. See, e.g., Jeffrey D. Winchester, Note, *Section 8(c) of the Proposed Restatement (Third) of Torts: Is It Really What the Doctor Ordered?*, 82 Cornell L. Rev. 644 (1997) (§ 8(c) now § 6(c) of Third Restatement; describing differences of opinion regarding comment *k.*); Annot., 70 A.L.R.4th 16 (1989) (collecting cases).

Only a few jurisdictions have interpreted comment *k.* in a manner that strictly excepts all prescription drugs from strict liability. Under the minority view, a drug that is properly manufactured and accompanied by an adequate warning of the risks known to the manufacturer at the time of sale is not defectively designed as a matter of law. *Brown v. Superior Court (Abbott Laboratories),* 44 Cal. 3d 1049, 751 P.2d 470, 245 Cal. Rptr. 412 (1988); *Grundberg v. Upjohn Co.,* 813 P.2d 89 (Utah 1991); *Young v. Key Pharmaceuticals,* 130 Wash. 2d 160, 922 P.2d 59 (1996) (en banc). These jurisdictions are commonly described by legal commentators as providing manufacturers with a "blanket immunity" from strict liability for design defects in prescription drugs. See, e.g., Winchester, *supra.* Our decision in *McDaniel, supra,* generally falls under this category of interpretation of comment *k.*

### *(iii) Cases Applying Risk-Utility Analysis Under Comment* k.

An application of comment *k.* to provide a blanket immunity from strict liability is widely criticized. Comment *k.* has proved to be difficult to interpret and apply, thus, supporting the argument that it should not be applied so strictly. See, Richard L. Cupp, Jr., *Rethinking Conscious Design Liability for Prescription Drugs: The* Restatement (Third) *Standard Versus a Negligence Approach,* 63 Geo. Wash. L. Rev. 76 (1994); Winchester, *supra.* Further, it is said that an approach that entirely excepts manufacturers from immunity limits the discretionary powers of the courts. *Id.* Also, it is argued that a blanket immunity leads to patently unjust results. *Id.* One court has stated:

> We believe that a more selective application [of comment *k.*] will encourage, rather than discourage, improvements in prescription products. Comment k was designed in part to protect new and experimental drugs. . . . "Comment k states: 'There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use.' Obviously, for this to be true, the design must be as safe as the best available testing and research permits." . . . Thus, a product which is as safe as current testing and research permits should be protected. The reverse is also true; a product which is not as safe as current technology can make it should not be protected.

(Citation omitted.) *Adams v. G.D. Searle & Co., Inc.,* 576 So. 2d 728, 732 (Fla. App. 1991).

The majority of jurisdictions that have adopted comment *k.* apply it on a case-by-case basis, believing that societal interests in ensuring the marketing and development of prescription drugs will be adequately served without the need to resort to a rule of blanket immunity. See, e.g., *Tobin v. Astra Pharmaceutical Products, Inc.,* 993 F.2d 528 (6th Cir. 1993); *Hill v. Searle Laboratories,* 884 F.2d 1064 (8th Cir. 1989); *Castrignano v. E.R. Squibb & Sons, Inc.,* 546 A.2d 775 (R.I. 1988); *Toner v. Lederle Laboratories,* 112 Idaho 328, 732 P.2d 297 (1987); *Ortho Pharmaceutical Corp. v. Heath,* 722 P.2d 410

(Colo. 1986), *overruled on other grounds, Armentrout v. FMC Corp.*, 842 P.2d 175 (Colo. 1992); *Feldman v. Lederle Laboratories*, 97 N.J. 429, 479 A.2d 374 (1984); *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo. 1983) (superseded by statute in regard to blood banks, as recognized in *United Blood Services v. Quintana*, 827 P.2d 509 (Colo. 1992). A few courts have not specifically adopted comment *k.* and have instead either fashioned their own rules or treated prescription drugs in the same manner as that of all other products. See, e.g., *Shanks v. Upjohn Co.*, 835 P.2d 1189 (Alaska 1992); *Collins v. Eli Lilly Co.*, 116 Wis. 2d 166, 342 N.W.2d 37 (1984); Thomas V. Van Flein, *Prospective Application of the Restatement (Third) of Torts: Products Liability in Alaska*, 17 Alaska L. Rev. 1 (2000) (citing cases).

Although a variety of tests are employed among jurisdictions that apply comment *k.* on a case-by-case basis, the majority apply the comment as an affirmative defense, with the trend toward the use of a risk-utility test in order to determine whether the defense applies. See Annot., 96 A.L.R.3d 22 (1979). See, e.g., *Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla. 1994); *Castrignano, supra; Toner, supra; Belle Bonfils Memorial Blood Bank, supra.* When a risk-utility test is applied, the existence of a reasonable alternative design is generally the central factor. See, e.g., *Tansy, supra; Toner, supra; Belle Bonfils Memorial Blood Bank, supra.* Because the application of comment *k.* is traditionally viewed as an exception and a defense to strict liability, courts generally place the initial burden of proving the various risk utility factors on the defendant. See, e.g., *Tansy, supra; Belle Bonfils Memorial Blood Bank, supra.* Thus, under these cases, the plaintiff's burden of proof for his or her prima facie case remains the same as it is in any products liability case in the given jurisdiction.

At the time *McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 241 N.W.2d 822 (1976), was decided, it reflected a minority view. Since that time, a clear majority of courts have decided on a case-by-case basis, through the application of a comment *k.* defense, the issue of liability of a manufacturer for a design defect in a prescription drug. On further reflection, we conclude that the rule of law expressed in *McDaniel* has not

held up over time. We now believe that societal interests in ensuring the marketing and development of prescription drugs can be served without resorting to a rule which in effect amounts to a blanket immunity from strict liability for manufacturers. Accordingly, we overrule *McDaniel* to the extent it applies comment *k.* to provide a blanket immunity from strict liability for prescription drugs. Accordingly, we must address how, or if, comment *k.* should be applied, or whether we should consider adopting provisions of the Third Restatement. We next address those provisions in considering what test should be applied.

### (b) Third Restatement

The provisions of the Second Restatement regarding products liability were changed dramatically in the Third Restatement, published by the American Law Institute in 1997. As stated in the introduction to the Third Restatement, the institute was required to answer questions that were not part of the products liability landscape when the Second Restatement was completed. Thus, the Third Restatement is a complete overhaul of the Second Restatement in the area of products liability.

Section 6 of the Third Restatement pertains specifically to prescription drugs, with § 6(c) applying to design defects. Section 6 at 144-45 states in part:

> (a) A manufacturer of a prescription drug or medical device who sells or otherwise distributes a defective drug or medical device is subject to liability for harm to persons caused by the defect. A prescription drug or medical device is one that may be legally sold or otherwise distributed only pursuant to a health-care provider's prescription.

> (b) For purposes of liability under Subsection (a), a prescription drug or medical device is defective if at the time of sale or other distribution the drug or medical device:

> (1) contains a manufacturing defect as defined in § 2(a); or

> (2) is not reasonably safe due to defective design as defined in Subsection (c); or

> (3) is not reasonably safe due to inadequate instructions or warnings as defined in Subsection (d).

(c) A prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

In addition, § 6, comment *b.* at 146-47, states in part:

The traditional refusal by courts to impose tort liability for defective designs of prescription drugs and medical devices is based on the fact that a prescription drug or medical device entails a unique set of risks and benefits. What may be harmful to one patient may be beneficial to another. Under Subsection (c) a drug is defectively designed only when it provides no net benefit to any class of patients. Courts have concluded that as long as a drug or medical device provides net benefits to some persons under some circumstances, the drug or device manufacturer should be required to instruct and warn health-care providers of the foreseeable risks and benefits. Courts have also recognized that the regulatory system governing prescription drugs is a legitimate mechanism for setting the standards for drug design. In part, this deference reflects concerns over the possible negative effects of judicially imposed liability on the cost and availability of valuable medical technology. This deference also rests on two further assumptions: first, that prescribing health-care providers, when adequately informed by drug manufacturers, are able to assure that the right drugs and medical devices reach the right patients; and second, that governmental regulatory agencies adequately review new prescription drugs and devices, keeping unreasonably dangerous designs off the market.

Nevertheless, unqualified deference to these regulatory mechanisms is considered by a growing number of courts to be unjustified. An approved prescription drug or medical device can present significant risks without corresponding advantages. At the same time, manufacturers must have ample discretion to develop useful drugs and

devices without subjecting their design decisions to the ordinary test applicable to products generally under § 2(b). Accordingly, Subsection (c) imposes a more rigorous test for defect than does § 2(b), which does not apply to prescription drugs and medical devices. . . .

. . . .

. . . Subsections (c) and (d) recognize common-law causes of action for defective drug design and for failure to provide reasonable instructions or warnings, even though the manufacturer complied with governmental standards.

Section 6, comment *f.* at 149, states in part:

A prescription drug or device manufacturer defeats a plaintiff's design claim by establishing one or more contexts in which its product would be prescribed by reasonable, informed health-care providers. That some individual providers do, in fact, prescribe defendant's product does not in itself suffice to defeat the plaintiff's claim. Evidence regarding the actual conduct of health-care providers, while relevant and admissible, is not necessarily controlling. The issue is whether, objectively viewed, reasonable providers, knowing of the foreseeable risks and benefits of the drug or medical device, would prescribe it for any class of patients. Given this very demanding objective standard, liability is likely to be imposed only under unusual circumstances. The court has the responsibility to determine when the plaintiff has introduced sufficient evidence so that reasonable persons could conclude that plaintiff has met this demanding standard.

As of this writing, no state court has faced the issue of whether to adopt § 6(c). A few federal courts have discussed this section, but only to the extent of either predicting whether the applicable state court would adopt § 6(c) or declining to apply it in the absence of state precedent. See, *Wheat v. Sofamor, S.N.C.*, 46 F. Supp. 2d 1351 (N.D. Ga. 1999); *Sita v. Danek Medical, Inc.*, 43 F. Supp. 2d 245 (E.D.N.Y. 1999); *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180 (D. Ariz. 1999); *Taylor v. Danek Medical, Inc.*, No. CIV.A. 95-7232, 1998 WL 962062 (E.D. Pa. Dec. 29, 1998).

There are several criticisms of § 6(c), which will be briefly summarized. First, it does not accurately restate the law. It has

been repeatedly stated that there is no support in the case law for the application of a reasonable physician standard in which strict liability for a design defect will apply only when a product is not useful for any class of persons. Rather, as illustrated by the discussion of the treatment of comment *k.* under the Second Restatement in other jurisdictions, the majority of courts apply some form of risk-utility balancing that focuses on a variety of factors, including the existence of a reasonable alternative design. The few cases that the Third Restatement cites to as support for the reasonable physician test also apply a risk-utility test. Thus, § 6(c) does not restate the law and instead seeks to formulate new law with no precedential support. See, e.g., George W. Conk, *Is There a Design Defect in the* Restatement (Third) of Torts: Products Liability? 109 Yale L.J. 1087 (2000); Richard L. Cupp, Jr., *The Continuing Search for Proper Perspective: Whose Reasonableness Should Be At Issue in a Product Design Defect Analysis? Seventh Annual Health Law Symposium Proving Product Defect After the Restatement (Third) of Torts: Product Liability*, 30 Seton Hall L. Rev. 233 (1999); Richard L. Cupp, Jr., *Rethinking Conscious Design Liability for Prescription Drugs: The* Restatement (Third) *Standard Versus a Negligence Approach*, 63 Geo. Wash. L. Rev. 76 (1994); Teresa Moran Schwartz, *Prescription Products and the Proposed* Restatement (Third), 61 Tenn. L. Rev. 1357 (1994); Michael J. Wagner and Laura L. Peterson, *The New Restatement (Third) of Torts—Shelter From the Product Liability Storm for Pharmaceutical Companies and Medical Device Manufacturers?* 53 Food & Drug L.J. 225 (1998).

Second, the reasonable physician test is criticized as being artificial and difficult to apply. The test requires fact finders to presume that physicians have as much or more of an awareness about a prescription drug product as the manufacturer. See, e.g., Conk, *supra.* The test also ignores concerns of commentators that physicians tend to prescribe drugs they are familiar with or for which they have received advertising material, even when studies indicate that better alternatives are available. *Id.*

A third criticism of particular applicability to Freeman's case is that the test lacks flexibility and treats drugs of unequal utility equally. For example, a drug used for cosmetic purposes but

which causes serious side effects has less utility than a drug which treats a deadly disease, yet also has serious side effects. In each case, the drugs would likely be useful to a class of patients under the reasonable physician standard for some class of persons. Consequently, each would be exempted from design defect liability. But under a standard that considers reasonable alternative design, the cosmetic drug could be subject to liability if a safer yet equally effective design was available. As a result, the reasonable physician standard of § 6(c) of the Third Restatement has been described as a standard that in effect will never allow liability. However, a standard applying a risk-utility test that focuses on the presence or absence of a reasonable alternative design, although also rarely allowing liability, at least allows the flexibility for liability to attach in an appropriate case. See, Cupp, 30 Seton Hall L. Rev. 233, *supra*; Cupp, 63 Geo. Wash. L. Rev. 76, *supra*; Conk, *supra*. See, also, Schwartz, *supra* (stating that § 6 arguably comes close to eliminating design claims altogether).

Fourth, the test allows a consumer's claim to be defeated simply by a statement from the defense's expert witness that the drug at issue had some benefit for any single class of people. Thus, it is argued that application of § 6(c) will likely shield pharmaceutical companies from a wide variety of suits that could have been brought under comment *k.* of the Second Restatement. See Wagner and Peterson, *supra*. As the Third Restatement, § 6(c), comment *f.* at 149, states in part: "Given this very demanding objective standard, liability is likely to be imposed only under unusual circumstances." Thus, even though the rule is reformulated, any application of § 6(c) will essentially provide the same blanket immunity from liability for design defects in prescription drugs as did the application of comment *k.* in the few states that interpreted it as such.

We conclude that § 6(c) has no basis in the case law. We view § 6(c) as too strict of a rule, under which recovery would be nearly impossible. Accordingly, we do not adopt § 6(c) of the Third Restatement.

It has also been suggested by at least one commentator that rather than apply either § 6(c) of the Third Restatement or a defense under comment *k.* of the Second Restatement for

unavoidably unsafe products, prescription drugs should be treated under the reasonable alternative design test in § 2(b) of the Third Restatement. See George W. Conk, *Is There a Design Defect in the* Restatement (Third) of Torts: Products Liability? 109 Yale L.J. 1087 (2000). Section 2(b) applies to products in general, rejects the consumer expectations test in favor of a risk-utility test, and requires the plaintiff to show the existence of a reasonable alternative design. However, because § 2(b) was written to apply to products in general and the parties in this case have not addressed whether it should be applied to prescription drugs, we decline to address § 2(b) as the test for prescription drugs, or any product, at this time.

We conclude that § 402 A, comment *k.*, of the Second Restatement should be applied on a case-by-case basis and as an affirmative defense in cases involving prescription drug products. Under this rule, an application of the comment does not provide a blanket immunity from strict liability for prescription drugs. Rather, the plaintiff is required to plead the consumer expectations test, as he or she would be required to do in any products liability case. The defendant may then raise comment *k.* as an affirmative defense. The comment will apply to except the prescription drug product from strict liability when it is shown that (1) the product is properly manufactured and contains adequate warnings, (2) its benefits justify its risks, and (3) the product was at the time of manufacture and distribution incapable of being made more safe. *Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla. 1994). See, also, *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987); *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo. 1983).

In this case, because the application of comment *k.* is an affirmative defense, Freeman was only required to plead that the Accutane she took was unreasonably dangerous under a consumer expectations test. Freeman alleged that Accutane was unreasonably dangerous for use, that it was not fit for its intended purpose, that the risks inherent in the design outweighed the benefits of its use, and that Accutane was more dangerous to Freeman than was anticipated due to undisclosed side effects. As facts supporting her allegations, Freeman alleged that Accutane is sold as an acne medication and that the side effects

of Accutane present life-threatening conditions. Thus, Freeman alleged facts that the Accutane was dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics. Accordingly, we conclude that Freeman has stated a theory of recovery based on a design defect.

## 2. MANUFACTURING DEFECT

Freeman also attempts to allege strict liability on the basis of a manufacturing defect. A manufacturing defect exists when the product differs from the plan and specifications of the manufacturer. See *Rahmig v. Mosley Machinery Co.*, 226 Neb. 423, 412 N.W.2d 56 (1987); Third Restatement § 2(a).

Freeman alleges that Hoffman was aware that if not properly manufactured, Accutane could become contaminated and would be likely to cause injury. Freeman further alleges that Hoffman acted carelessly in its manufacture and inspection of the Accutane. Freeman also alleges that the Accutane she took was improperly manufactured and inspected. She, however, does not allege facts to support these allegations. In reviewing an order sustaining a demurrer, an appellate court accepts the truth of the facts which are well pled, together with the proper and reasonable inferences of law and fact which may be drawn therefrom, but does not accept the conclusions of the pleader. *Wilkinson v. Methodist, Richard Young Hosp.*, 259 Neb. 745, 612 N.W.2d 213 (2000). We conclude that Freeman has stated only conclusions instead of factual allegations. Accordingly, we determine that she has failed to state a theory of recovery for a manufacturing defect.

## 3. FAILURE TO WARN

Freeman alleges that Hoffman was negligent in failing to warn of dangers associated with the use of Accutane. Freeman also alleges that Hoffman failed to warn that Accutane was not adequately tested.

Under the Third Restatement § 2(c) at 14,

> [a product] is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the pro-

vision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

The Third Restatement reflects the same rule this court has applied in regard to a failure to warn. We have stated:

> In a products liability case based on negligence and the duty to warn: "A manufacturer or other seller is subject to liability for failing either to warn or adequately to warn about a risk or hazard inherent in the way a product is designed that is related to the intended uses as well as the reasonably foreseeable uses that may be made of the products it sells." . . . "[A] manufacturer's duty to produce a safe product, with appropriate warnings and instructions when necessary, is no different from the responsibility each of us bears to exercise due care to avoid unreasonable risks of harm to others. . . ."

*Rahmig*, 226 Neb. at 446, 412 N.W.2d at 72.

Pharmaceutical products have historically been treated differently in regard to a duty to warn. Although in ordinary product cases, a manufacturer's duty to warn runs directly to the consumer of the product, in cases involving prescription drugs, it is widely held that the duty to warn extends only to members of the medical profession and not to the consumer. Annot., 57 A.L.R.5th 1 (1998) (collecting cases). See, e.g., *Perez v. Wyeth Laboratories, Inc.*, 161 N.J. 1, 734 A.2d 1245 (1999); *Tansy v. Dacomed Corp.*, 890 P.2d 881 (Okla. 1994). This concept, known as the learned intermediary doctrine,

> is based upon the premise that, as a medical expert, a patient's prescribing or treating physician is in the best position to evaluate the often complex information provided by the manufacturer concerning the risks and benefits of its drug or product and to make an individualized medical judgment, based on the patient's particular needs and susceptibilities, as to whether the patient should use the product.

57 A.L.R.5th at 26.

The learned intermediary doctrine is provided for in § 6(d) of the Third Restatement. Section 6(d) at 145 states:

A prescription drug or medical device is not reasonably safe due to inadequate instructions or warnings if reasonable instructions or warnings regarding foreseeable risks of harm are not provided to:

(1) prescribing and other health-care providers who are in a position to reduce the risks of harm in accordance with the instructions or warnings; or

(2) the patient when the manufacturer knows or has reason to know that health-care providers will not be in a position to reduce the risks of harm in accordance with the instructions or warnings.

We have not specifically adopted the learned intermediary doctrine as the applicable test for determining whether a manufacturer may be liable for a warning defect in prescription drug cases. However, with a few exceptions for instances where special facts require a direct warning to the consumer, the doctrine is followed in virtually all jurisdictions that have considered whether to adopt it. See Annot., 57 A.L.R.5th 1, *supra.* The doctrine as stated in the Third Restatement has also been adopted in other jurisdictions. See, *Perez, supra*; *Tenuto v. Lederle Laboratories*, 181 Misc. 2d 367, 695 N.Y.S.2d 259 (1999). We adopt § 6(d) of the Third Restatement. Accordingly, we apply the learned intermediary doctrine to Freeman's case.

The section of Freeman's petition devoted to factual allegations alleges that Hoffman failed to warn of Accutane's dangers in the package insert provided to physicians, including Freeman's physician. Freeman makes further allegations regarding Hoffman's failure to provide her with warnings under the section specifically devoted to her theory of recovery for a failure to warn. Thus, we conclude that Freeman has stated a theory of recovery for liability based on a warning defect.

### 4. IMPLIED AND EXPRESS WARRANTY

Freeman also alleges in her petition theories of recovery for breach of implied warranty on the basis that Accutane was not fit for its intended purpose and for breach of express warranty on the basis that Hoffman expressly warranted that Accutane was of merchantable quality.

### (a) Implied Warranty

Applying the Second Restatement, many courts have merged theories of recovery for breach of implied warranty and strict liability on the basis that each theory states the same strict liability claim. See *Gebhardt v. Mentor Corp.*, 191 F.R.D. 180 (D. Ariz. 1999), citing *Scheller v. Wilson Certified Foods, Inc.*, 114 Ariz. 159, 559 P.2d 1074 (Ariz. App. 1976) (breach of implied warranty claims merged with strict liability claims). In addition, a majority of jurisdictions have merged theories of recovery for negligence based on design defects and for negligent failure to warn with implied warranty theories. See, *Vassallo v. Baxter Healthcare Corporation*, 428 Mass. 1, 696 N.E.2d 909 (1998) (adopting § 2(c) of Third Restatement); *Gebhardt, supra*, citing *Scheller, supra*; David R. Geiger and Stephanie Copp Martinez, *Design and Warning Defect Claims Under Massachusetts Product Liability Law: Completing the Merger of Negligence and Warranty*, 43 Boston Bar J. 12 (1999).

In merging theories of recovery, courts have reasoned that strict liability and implied warranty of merchantability are parallel theories of recovery—one in contract and the other in tort. See, e.g., *Castrignano v. E.R. Squibb & Sons, Inc.*, 546 A.2d 775 (R.I. 1988). As the court in *Castrignano* explained: "[W]hen an implied-warranty action cannot be distinguished from a strict-liability action under § 402A, a comment-k defense operates as a defense to implied-warranty claims because these two theories of liability express a single basic public policy." *Castrignano*, 546 A.2d at 783, citing *Belle Bonfils Memorial Blood Bank v. Hansen*, 665 P.2d 118 (Colo. 1983). Our decision in *McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 202, 241 N.W.2d 822, 829 (1976), indicated similar reasoning: " 'Where there is a proper warning, a manufacturer of a prescription drug cannot be held liable either on a breach of warranty or strict liability in tort theory.' "

We have stated that in order to recover for breach of an implied warranty of merchantability, there must be proof that there was a deviation from the standard of merchantability at the time of sale and that such deviation caused the injury. See *Delgado v. Inryco, Inc.*, 230 Neb. 662, 433 N.W.2d 179 (1988). A breach of warranty has been found to exist where the item

sold failed to perform adequately because of a lack of quality inherent in the item itself. *Id.* However, a plaintiff cannot rely solely on the fact that an accident occurred as proof that the product was not merchantable. *Id.* Thus, under our law, a plaintiff seeking to recover under a breach of implied warranty theory is seeking to recover for what is essentially an alleged manufacturing defect or design defect.

The Third Restatement recognizes the merger of doctrines by adopting a single theory approach. Instead of focusing on doctrinal tort categories such as negligence or strict liability, the Third Restatement functionally defines each of the three basic types of product defect claims: design, manufacturing, and warning defect claims. The Third Restatement adopts the position that the definition of "defect" is the important issue and should remain the same regardless of the doctrinal tort category under which it is brought. Geiger and Copp Martinez, *supra.* Thus, the Third Restatement § 2, comment *n.* at 35-36, states:

> This Restatement contemplates that a well-coordinated body of law governing liability for harm to persons or property arising out of the sale of defective products requires a consistent definition of defect, and that the definition properly should come from tort law, whether the claim carries a tort label or one of implied warranty of merchantability.
>
> . . . .
>
> A separate and more difficult question arises as to whether a case should be submitted to a jury on multiple theories of recovery. Design and failure-to-warn claims may be combined in the same case because they rest on different factual allegations and distinct legal concepts. However, two or more factually identical defective-design claims or two or more factually identical failure-to-warn claims should not be submitted to the trier of fact in the same case under different doctrinal labels. Regardless of the doctrinal label attached to a particular claim, design and warning claims rest on a risk-utility assessment. To allow two or more factually identical risk-utility claims to go to a jury under different labels, whether "strict liability," "negligence," or "implied warranty of merchantability,"

would generate confusion and may well result in inconsistent verdicts.

Commentators have generally recommended adoption of § 2(b) of the Third Restatement approach, which in effect merges warranty liability theories of recovery with design and warning defect theories. See, e.g., David R. Geiger and Stephanie Copp Martinez, *Design and Warning Defect Claims Under Massachusetts Product Liability Law: Completing the Merger of Negligence and Warranty*, 43 Boston Bar J., 12, 26 (1999) ("[t]riers of fact should not have to decide identical causes of action twice merely because the theories have evolved under different tort labels").

■ We find this reasoning persuasive. Thus, instead of deciding whether Freeman stated a theory of recovery for breach of implied warranty, we simply recognize that her allegations regarding breach of implied warranty fall under her allegations of design and manufacturing defects.

### (b) Express Warranty

We treat Freeman's express warranty claim differently. Express warranty is grounded in terms of an express promise made as part of a pending purchase. Thus, unlike implied warranties, there is a clearer contractual difference between a theory of recovery based on express warranty and a tort theory of recovery based on a product defect. Thus, we are not convinced that we should endeavor to merge those theories of recovery. Accordingly, we address whether Freeman has stated a theory of recovery for breach of express warranty.

■ Neb. U.C.C. § 2-313 (Reissue 1992) requires that in order to create an express warranty, the seller must make an affirmation of fact or promise to the buyer which relates to the goods and becomes part of the basis of the bargain. The comments indicate that express warranties rest on "dickered" aspects of the individual bargain. See *id.*, comment 1.

The only allegation Freeman made regarding express warranty was that Hoffman expressly warranted to her that Accutane was of marketable condition and that she relied on this warranty. Freeman did not allege any factual basis for this assertion. Further, Hoffman did not allege that any such warranty was

the basis of a bargain between herself and Hoffman. Thus, Freeman did not allege a theory of recovery for breach of express warranty.

### 5. MISREPRESENTATION

Freeman alleges a theory of recovery labeled simply "Misrepresentation" in her petition. In her general factual allegations, Freeman alleges that Hoffman knew of the danger of Accutane, but misled the medical community with incomplete and inaccurate information regarding the safety of the drug. In the section devoted to misrepresentation, Freeman alleges that Hoffman falsely represented to her that Accutane was safe to use as instructed and labeled, when in fact it was not safe. Freeman then alleges that she relied on the misrepresentation and that the misrepresentation induced her to use Accutane.

Section 9 of the Third Restatement pertains to liability of a commercial product seller or producer for harm caused by misrepresentation and provides: "One engaged in the business of selling or otherwise distributing products who, in connection with the sale of a product, makes a fraudulent, negligent, or innocent misrepresentation of material fact concerning the product is subject to liability for harm to persons or property caused by the misrepresentation."

Comment *b.* indicates that § 9 is derived from the Second Restatement § 402 B and that the provision regarding liability for innocent product misrepresentations is generally applied only to public misrepresentations, if applied at all. Comment *e.*, § 9, of the Third Restatement notes that separate causes of action available under the Uniform Commercial Code, such as breach of warranty, can be combined in the same case with a claim for misrepresentation. Comment *d.* notes that a plaintiff is not required to show that the product was defective at the time of sale or distribution within the meaning of other sections of the Third Restatement.

We have recognized fraudulent misrepresentation as a cause of action with the following elements:

(1) that a representation was made; (2) that the representation was false; (3) that when made, the representation was known to be false or made recklessly without knowledge

of its truth and as a positive assertion; (4) that it was made with the intention that the plaintiff should rely upon it; (5) that the plaintiff did so rely; and (6) that he or she suffered damage as a result.

*Gibb v. Citicorp Mortgage, Inc.*, 246 Neb. 355, 360, 518 N.W.2d 910, 916 (1994). We decline to adopt § 9 of the Third Restatement, and we instead apply the principles stated in *Gibb*.

In *Adams v. G.D. Searle & Co., Inc.*, 576 So. 2d 728 (Fla. App. 1991), the plaintiff alleged that she was injured by the use of a defective intrauterine device (IUD). The plaintiff then alleged that the pharmaceutical company had misrepresented and omitted specific material facts about the IUD to her and the prescribing physician with the intention to induce them to rely on the misrepresentations and omissions and that they did so to the plaintiff's detriment. The court concluded that such an allegation stated a cause of action for fraud.

Freeman's allegations are substantially the same as those in *Adams* and allege the elements set forth in *Gibb*. When the sections of Freeman's petition pertaining to general factual allegations and misrepresentation are read together, she has stated a cause of action for fraudulent misrepresentation.

### 6. Fear of Future Product Failure

Freeman contends that we have recognized a cause of action for fear of future product failure based on her interpretation of our opinion in *Hartwig v. Oregon Trail Eye Clinic*, 254 Neb. 777, 580 N.W.2d 86 (1998).

In *Hartwig*, we allowed a plaintiff to prove as an element of damages the mental suffering and anxiety she suffered due to her fear of contracting AIDS after she was inadvertently stuck with a hypodermic needle. We did not establish in *Hartwig* a separate cause of action or theory of recovery for fear of future product failure. A search of case law in other jurisdictions has also not revealed support for adopting such a cause of action. Accordingly, Freeman's assignment of error on this issue is without merit.

### 7. Negligence

Freeman alleges, rephrased, that Hoffman had a duty to exercise reasonable care throughout a variety of stages of the manu-

facturing process such as testing, inspection, and packaging. Freeman further alleges that each stage was negligently and carelessly performed, resulting in her injury.

Aside from pleading theories of recovery under strict liability for specific product defects, a plaintiff may assert a theory of recovery based on negligence. See, generally, *Ackles v. Luttrell*, 252 Neb. 273, 561 N.W.2d 573 (1997). See, also, *Insolia v. Philip Morris Inc.*, 216 F.3d 596 (7th Cir. 2000) (failure of strict liability claim does not preclude claim for negligence); *Toner v. Lederle Laboratories*, 112 Idaho 328, 732 P.2d 297 (1987) (if plaintiff cannot produce evidence of design, manufacturing, or warning defect, he or she should not be precluded in essaying cause of action in negligence). Thus, even if a comment *k.* defense is determined to apply to exempt the defendant from strict liability, the plaintiff can always attempt to show that the defendant acted negligently. See *Toner, supra*. In this case, however, Freeman did not assert any specific factual allegations of negligence and alleged only conclusions. Thus, Freeman has not stated a theory of recovery for negligence.

## V. CONCLUSION

We overrule *McDaniel v. McNeil Laboratories, Inc.*, 196 Neb. 190, 241 N.W.2d 822 (1976), to the extent it applies § 402 A, comment *k.*, of the Second Restatement to provide a blanket immunity from strict liability for prescription drugs. Instead, we require a plaintiff to plead that the drug was unreasonably dangerous under a consumer expectations test and apply comment *k.* as an affirmative defense on a case-by-case basis. We also adopt the learned intermediary doctrine as reflected in § 6(d) of the Third Restatement as the test to be applied when considering whether a warning defect exists in a prescription drug. Further, in this case, we merge the theories of breach of implied warranty with the theories of design and manufacturing defects. We decline to adopt § 9 of the Third Restatement as the test for misrepresentation, and we do not recognize a cause of action for fear of future product failure.

Applying the allegations in Freeman's petition to the legal tests, we conclude that Freeman failed to state a theory of recovery for liability based on a manufacturing defect, express war-

ranty, or negligence. Freeman did, however, state theories of recovery for liability based on a design defect, warning defect, and misrepresentation. Accordingly, the district court erred in sustaining Hoffman's demurrer. We reverse, and remand for further proceedings to allow Freeman to amend her petition.

REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.